**Jo Ann CHESSER, Appellant,**

v.

**TEXAS DEPARTMENT OF HUMAN RESOURCES, Appellee.**

**No. 1567.**

Court of Civil Appeals of Texas, Corpus Christi.

Feb. 21, 1980.

Sue Rossen Tejml, Bay City, for appellant.

Kathryn A. Reed, Asst. Atty. Gen., Austin, for appellee.

OPINION

BISSETT, Justice.

This case involves an appeal [1] by Jo Ann Chesser [Jo Ann], the natural mother of the child, P. A. C., from a judgment of the trial court which terminated her parental rights over the child, and which awarded managing conservatorship of the child to the Wharton-Matagorda County Child Welfare Unit of the Texas Department of Human Resources [State]. This suit was brought by the State under Tex. Family Code Ann. § 15.02(1)(E) and (2) (Supp. 1980).[2] Trial was to the court, sitting without a jury. Trial commenced on May 25, 1979, and judgment was rendered on June 1, 1979.

On February 13, 1978, a hearing, at which Jo Ann personally appeared, was held, and the judge appointed the Supervisor of the Wharton-Matagorda County Child Welfare Unit temporary managing conservator of the child. Such appointment was continued by several orders and was made permanent by the judgment, which is being appealed.

The child involved is a female child, who was born on October 15, 1977. The State took physical possession of her on February 4, 1978. She has resided with foster parents continuously since February 4, 1978. She was 3½ months old when she was taken away from Jo Ann and was 19 months old at the time of the trial.

The only bases for termination asserted by the State are the following portions of Section 15.02 of the Code:

"§ 15.02. Involuntary Termination of Parental Rights.

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

.     .     .     .     .

(E) Engaged in conduct or knowingly placed the child with persons who en-

---

1. This termination suit was also brought against William G. Chesser, Jr., the ex-husband and natural father of the child. The father defaulted in the trial court, and is not a party to this appeal.

2. Unless otherwise noted, all statutory references to Tex. Family Code, will use the word "Code."

gaged in conduct which endangers the physical or emotional well-being of the child; . . .

. . . . .

(2) termination is in the best interest of the child."

■ The judgment recites "that Jo Ann Chesser has engaged in conduct which endangered the physical or emotional well-being of the child," and further recites "that termination of the parent-child relationship between Jo Ann Chesser and the child is in the best interest of the child." Both elements are essential to the judgment. *Wiley v. Spratlan*, 543 S.W.2d 349, 350 (Tex.Sup. 1976). A judgment terminating a parent-child relationship under Section 15.02 of the Code cannot be based solely upon the trial court's determination of what would be in the best interest of the child. *Holley v. Adams*, 544 S.W.2d 367 (Tex.Sup.1976).

There is an important difference in the nature of the proof required in a suit for conservatorship, and in proceedings for an involuntary termination of the parent-child relationship. This difference is succinctly explained by Justice Pope in *Wiley v. Spratlan*, supra, on pages 351–352 of the published opinion.

In *Gonzalez v. Texas Department of Human Resources*, 581 S.W.2d 522, 527 (Tex. Civ.App.—Corpus Christi 1979, writ ref'd n. r. e.), this Court, speaking through Chief Justice Nye, said:

"At the outset we recognize that actions which break the ties between a parent and child 'can never be justified without the most solid and substantial reasons.' *State ex rel. Wood v. Deaton*, 93 Tex. 243, 54 S.W. 901 (1900). First, there is the strong presumption that a child's foremost interest is usually best served by keeping custody in and with the natural parents. This is based on a logical belief that the ties of the natural relationship of parent and child ordinarily bring about strong assurances and genuine efforts on the part of the custodians to provide the child with the best of care and most beneficial opportunities possible. Usually, the best atmosphere for mental, moral

and emotional development of the child is with its natural parent. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.Sup.1976), citing *Mumma v. Aguirre*, 364 S.W.2d 220 (Tex.Sup.1963). . . ."

In a case where the record shows that the family environment is simply less than ideal, as is the case here, the courts will not order termination unless 1) there is tangible evidence of emotional or physical danger to the child, and 2) termination is in the best interest of the child. The Court, in the case styled "*In Matter of R___ E___ W___,*" 545 S.W.2d 573, 580 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n. r. e.), reversed the trial court's judgment of termination and remanded the cause, and in so doing, stated:

"The testimony depicts a mother who is attempting to rear her child under extremely difficult circumstances. She is admittedly an imperfect parent and an ineffective housekeeper. She is an alcoholic with related emotional difficulties, causing periods of anxiety and depression. She has become reliant on drugs to maintain a day to day sense of stability. She is alone, without husband or family; her income is meager and she has no transportation. She has a heart condition which, at least in her belief, prevents her from working and from keeping her house clean and relatively neat. Her child Rebecca is frail, under-developed physically and mentally, and probably lacks proper nourishment on a regular basis. The extent of emotional disturbance of the child can only be a subject of speculation, based upon her reported conduct."

■ We are presented with "no evidence" points, "factual insufficiency" points and "against the great weight and preponderance of the evidence" points which challenge the findings in the judgment 1) that Jo Ann had engaged in conduct which endangered the physical or emotional well-being of the child and 2) that termination was in the best interest of the child. In disposing of the no evidence points we review the

evidence in the light most favorable to the judgment, consider only the evidence and permissible inferences which support it, and reject all evidence and inferences contrary thereto. *Rourke v. Garza*, 530 S.W.2d 794, 799 (Tex.Sup.1975). In disposing of the factual insufficiency and against the great weight and preponderance of the evidence points, we review, consider and weigh all of the evidence as required by *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

█ Mr. James Sparks, a Deputy Sheriff of Matagorda County, Texas, on either February 1 or 2, 1978, received a telephone call from Mrs. Thelma Keener, the owner of a trailer house which was then occupied by Jo Ann, her mother (Mrs. Horyza), and the child, P. A. C. The subject of the call was a "disturbance," allegedly caused by Jo Ann and her mother. Deputy Sparks responded to the call, but upon investigation determined that the matter was civil in nature, and since no criminal charge was filed, refused to do anything about the incident. Later in the day, Mr. and Mrs. Keener signed a complaint which charged Jo Ann and her mother with theft of some stereo records and bed clothing from the trailer. Deputy Sparks, acting on a warrant, then arrested Jo Ann and her mother and placed them in jail. Jo Ann was released from jail on March 18, 1978. Prior to being taken to jail, Jo Ann placed her child in the custody of a Mr. and Mrs. Tidwell. On February 4, 1978, the Tidwells telephoned Deputy Sparks and told him that they could no longer care for the child. The deputy then notified the local Child Welfare Unit, an agency of the State, which took physical possession of the child.

Mrs. Keener said that she rented the trailer to "them" because "they couldn't find a place to stay and had been sleeping on the beach." She asked Jo Ann and her mother to vacate the trailer because Jo Ann would come to a bar, owned by Mrs. Keener and in the vicinity of the trailer, on occasion and would threaten different persons in the bar and would cause disturbances, because she thought "they" were "persecuting her." She also said that Jo Ann "threatened me,"

and that after Jo Ann and her mother moved out she "found some items missing." She further stated, that she never had any more dealings with them at any time thereafter, but "when I come to Bay City . . if I see them, Mrs. Chesser makes obscene gestures and screams." However, Mrs. Keener also testified that she had no reason to believe that Jo Ann was not taking proper care of the child, and that the trailer during the time it was occupied by Jo Ann was in "fair cleanliness . . . it wasn't trashy."

In January, 1978, Ms. Havard, a worker for the Matagorda County Food Stamp Program, visited a young woman who was also living in the trailer. While she was there, she talked to Jo Ann. The child was present, and according to Ms. Havard, "seemed lethargic." That was the only time Ms. Havard saw the child. Sometime afterward, when Ms. Havard was visiting Jo Ann at her mother's house, a noise from outside caused Jo Ann to jump up and run outside with a baseball bat "as though she was going to attack" whoever or whatever caused the noise. She further testified that (at some indeterminate time) Jo Ann and her mother appeared at the Food Stamp Office and asked for medical assistance, and when they were informed that they were required to first go "through the process that was necessary for assistance," they became belligerent and loud, used obscene, abusive and threatening language. The clerk at the office was in the process of telephoning the police when they left.

Mrs. Nan Eldridge, the child welfare worker assigned to the case in February, 1978, testified that when the child was originally placed in the possession of the Child Welfare Unit by Deputy Sparks, the right hand side of her head was flat; she was listless; there was a ridge on her head, as if bones had not come together properly; and there were "rubbed" marks on her heel. The child was examined by a doctor, who reported that she was anemic, and nothing more. After Jo Ann was released from jail, she and her mother visited the child several times at the headquarters of the Child Wel-

fare Unit. Each visit, according to Mrs. Eldridge, was "loud," and characterized by a "shuffling" back and forth of the child between Jo Ann and her mother. Mrs. Eldridge also visited the place where Jo Ann and her mother were living shortly after Jo Ann was released from jail. In her opinion, it was not adequate for proper child care because there was no place for the child to sleep; she further testified that Jo Ann was "verbally violent" on two occasions regarding the return of the child. Pursuant to a suggestion by Mrs. Eldridge, Jo Ann agreed to enroll in a counseling program. Following that agreement, it was agreed between Mrs. Eldridge and Jo Ann, apparently in late October, 1978, that the child would be returned to Jo Ann; but, on the eve of the child's planned return to Jo Ann, she was "kicked" out of the place where she lived by her mother.

The child was not returned to Jo Ann because of Mrs. Eldridge's opinion that "the home was too unstable." Mrs. Eldridge also told the judge that there were three occasions when Mrs. Horyza had "kicked her (Jo Ann) out." As a further reason for believing that it was not in the best interest of the child to return her to Jo Ann, Mrs. Eldridge said that in December, 1978, Jo Ann telephoned her from Missouri and told her that she would not be home for Christmas because she was being treated for syphilis.

When specifically asked had Jo Ann ever done anything which Mrs. Eldridge "thought would physically or emotionally endanger the child's well-being," she answered "yes," based on the following: 1) On April 4, 1978, during a visit with the child at the Unit's service center, Jo Ann did not "hold the baby very much" because of the "excuse" that she had a sore wrist; 2) On May 18, 1978, during a visit to the service center, a worker encouraged Jo Ann "to give the baby a bottle because she was fussing; she laid her down on the bench and held the bottle for the baby"; 3) on August 23, 1978, Jo Ann, during an unsupervised visit, during the extreme heat of the day, took the child for a walk, and when Mrs. Eldridge first saw the child, "the baby was extremely flushed and had no protection from the noonday heat and such as that, no umbrella or anything"; 4) "not having a place to live when her mother kicked her out"; 5) "when the baby is changed (during a supervised visit), I have to encourage Jo Ann to change the diaper"; and 6) during one visit, "Jo Ann told me . . . . she was shooting darts at the door."

Mrs. Eldridge further testified that Jo Ann never physically abused the child but that she did feel that her conduct was such that it would endanger the emotional well-being of the child. She based this conclusion on the following facts: 1) she did not have a place to live when her mother kicked her out; 2) she hitchhiked to Missouri and back to Bay City on several occasions; 3) an aide told her that on one occasion that Jo Ann gave the child "chips and bananas at 10:30 in the morning and at 2:00 in the afternoon but did not feed her the food provided by the foster mother."

Mrs. Eldridge also said that the child was not developing normally "for an eighteen month old child." She based that observation on the fact that she just started walking at the age of nineteen months." Her motor development is "approximately 4 to 5 months behind." Regarding the visits by Jo Ann at the Service Center, Mrs. Eldridge observed a lack of "interaction" by Jo Ann with the child and that she would express maternal feelings only during the first few minutes of each visit.

Dr. Donald J. Minnick, a clinical psychologist, examined and tested Jo Ann on March 9, 1979, to determine "whether or not it might be best to return the child" to her. The examination and testing required "about an hour, maybe a little bit longer." In summary, Dr. Minnick testified: 1) although Jo Ann scored average on a test designed to approximate intellectual functioning, her actual ability is probably borderline retarded; 2) the tests indicated the *possibility* of an explosive temper which *might* be taken out on the child; 3) he did not believe that defendant would deliber-

ately harm the child; 4) he would not have any hesitancy, objection or misgiving about returning the child to Jo Ann, provided she was adequately supervised concerning the parent-child relationship by qualified personnel; and 5) he doubted that Jo Ann would remain in one place long enough to receive the required supervision.

The physical deficiencies noted by Mrs. Eldridge on February 4, 1978, when the child was placed in the Child Welfare Unit's possession, were caused not by any acts or omissions consistent with any form of abuse by Jo Ann, but, apparently, resulted from organic causes. This conclusion on our part is reinforced by the doctor who examined the child, since his only comment was that the child was "anemic." Another fact which points to an organic cause of the child's physical deficiencies is the fact that at the time of trial she had spent the preceding 15½ months of her life in the custody of the Child Welfare, during which time her motor skills should have been developing. The slow development cannot be attributed to any act or omission by Jo Ann.

Jo Ann denied that she ever told Mrs. Eldridge that she was being treated for syphilis. She testified that while in Missouri in late 1978, she was informed that her husband (Charlie McDonald), sometime in early 1978, had had syphilis, and that she voluntarily went to a doctor (in late 1978) for an examination, the result of which was negative. Her income at the time of trial was about $175.00 per month, and she was then living with her mother and sister-in-law in an apartment which had a baby bed, air conditioning, heat and cooking facilities. She wanted her child returned to her. Concerning the matter of sleeping on the beach prior to moving to the trailer, Jo Ann said that she, the child and two of her brothers spent one night on the beach and that the child spent the night in the car.

There is no evidence that Jo Ann did anything improper which prompted Deputy Sparks' first visit to the trailer in early February, 1978, nor is there any evidence that she behaved improperly at any time while Deputy Sparks was on the premises.

There is no evidence that Jo Ann and her mother were ever prosecuted for theft, nor is there any evidence that anyone filed criminal charges relating to the "disturbances" which some of the aforesaid witnesses said were caused by Jo Ann and her mother; the same is true with respect to the "threats" that some of the witnesses said were made. There is no evidence that Jo Ann ever committed a single act of violence at any disturbance. On the other hand, it is conclusively shown by the evidence that the disturbances were caused only by loud and profane language, accompanied in some cases by obscene gestures and verbal threats, none of which are elaborated on by the witnesses called by the State. There is no evidence that Jo Ann, at any time, physically abused the child, or did not properly take care of the child. There is no evidence that she placed the child with a person who engaged in conduct which endangered the physical or emotional well-being of the child.

The record as a whole contains certain facts known to the witnesses but also contains many factual statements from them which are based upon speculation, conjecture and hearsay. Our review of the evidence reveals that while Jo Ann never engaged in conduct which endangered the physical or emotional well-being of the child during the brief time the child was in her possession (the first 3½ months of her life), there is some evidence, meager though it is, that Jo Ann's conduct towards others might endanger the emotional or physical well-being of the child if she is returned to Jo Ann. That is so because of her inability to control her own temper and her propensity to act out her temper in at least three instances, which if done while the child was in her custody might have an emotional impact upon the child.

It was also established that Jo Ann was in need of counseling, but that because she did not remain in any one location for any substantial length of time, it was, as a practical matter, impossible for her to receive any counseling which would be meaningful. Furthermore, Dr. Minnick testified,

in substance, that because of an explosive temper, Jo Ann might vent her temper on the child, and that he would recommend that the child be returned to Jo Ann *only* if Jo Ann was closely supervised by properly qualified counselors.

Such evidence is of some probative value which supports the trial court's findings set out in the judgment. However, all of the evidence, taken together, is factually insufficient to sustain the decree of termination, and the findings of fact contained in the judgment are against the great weight and preponderance of the evidence. Most of the facts and inferences relied on by the State arose out of a highly strained and artificial situation following and placing of the child in the custody of the Child Welfare Unit. Moreover, there is absolutely no evidence regarding the child's future in the event of termination.

The no evidence points are overruled, and the factually insufficient evidence points and the great weight and preponderance of the evidence points are sustained. In view of our disposition of this appeal, there is no need for us to discuss the remaining points of error.

The judgment of the trial court is RE-VERSED and the cause is REMANDED to the trial court for further proceedings.