### In the Interest of J.L.S.

### No. 13–89–398–CV.

Court of Appeals of Texas, Corpus Christi.

June 22, 1990.

Ronald B. Collins, Duckett, Bouligny, Collins & Clapp, El Campo, for appellant.

Paul Webb, Scott Cline, Cline & Cline, Robinson C. Ramsey, Wharton, for appellee.

Before NYE, C.J., and SEERDEN and DORSEY, JJ.

## OPINION

NYE, Chief Justice.

Jenny Stevens Partida appeals from a jury verdict that terminated her parental rights to her daughter, J.L.S., and which appointed the Texas Department of Human Services as the child's managing conservator. We affirm the judgment of the trial court.

By four points of error, Jenny challenges the legal and factual sufficiency of the evidence to support the jury findings that she knowingly placed or knowingly allowed her child to remain in conditions or surroundings which endangered the child's physical or emotional well-being, that she engaged in conduct which endangered the physical and emotional well-being of the child, and that termination of her parental rights was in the best interest of the child. *See* Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1990).

■ Termination of parental rights is of constitutional dimensions and can never be justified absent the most solid and substantial of reasons. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985); *Doria v. Texas Dept. of Human Resources,* 747 S.W.2d 953, 954 (Tex.App.—Corpus Christi 1988, no writ); *Chesser v. Texas Dept. of Human Resources,* 595 S.W.2d 615, 617 (Tex. Civ.App.—Corpus Christi 1980, no writ). In a suit in which termination of the parent-child relationship is sought, each finding required for termination of the parent-child relationship must be based on clear and convincing evidence. *Santosky v. Kramer,* 455 U.S. 745, 746–48, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599 (1980); *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex. 1984); Tex.Fam.Code Ann. § 11.15(b) (Vernon 1986). The clear and convincing evidence standard is that degree of proof which will produce in the mind of the trier of fact a firm conviction or belief that the allegations sought to be established are true. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979); *Doria,* 747 S.W.2d at 954–55; Tex.Fam.Code Ann. § 11.15(c) (Vernon 1990). In a suit to involuntarily terminate parental rights under § 15.02, the State must prove not only that the parent committed an act or omission defined within § 15.02(1) but also that termination of parental rights is in the child's best interests. *Texas Dept. of Human Serv. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *Richardson,*

677 S.W.2d at 499; Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1990).

■ The record indicates that J.L.S. was born in July, 1986 to Jenny Stevens and Stanley Southwood.[1] Jenny and Southwood cohabitated in a residence located in Wharton County. In April, 1978, caseworkers from the Wharton–Matagorda County Child Welfare Unit of the Texas Department of Human Services (WMCCWU) investigated a referral regarding the alleged abuse of nine-month old J.L.S. The investigators found that the child had sustained sufficient physical abuse that she required medical treatment and an overnight stay in the hospital. Jenny accompanied the child and the caseworkers to the hospital, but subsequently went home to Southwood, leaving the child alone with the hospital staff for the overnight stay. WMCCWU placed J.L.S. in a foster-care home the next day.

Confronted by the authorities, Jenny related several improbable versions regarding how J.L.S. received her bruises and wounds. Finally, she made an official statement that Southwood had abused the child. Southwood was convicted of child abuse and sent to the Texas Department of Corrections in July 1987. That same month, Jenny gave birth to a son fathered by Southwood.

Jenny asserts that her parental rights should not be terminated because only Southwood beat the child. She points to the fact that her other children have not been abused because Southwood is no longer associated with her family.

"Endanger" as used in Tex.Fam.Code Ann. § 15.02(1)(D) and (1)(E), means "to expose to loss or injury; to jeopardize." *Boyd*, 727 S.W.2d at 533. The record reveals that, on almost a daily basis, Southwood beat, tortured and assaulted J.L.S. from the time she was three months old until her removal from the residence at nine months of age. Jenny testified that she witnessed Southwood perform such abusive acts as repeatedly striking J.L.S.

about the head with his fists, biting her extremities, and force-feeding her scalding-hot formula. Southwood would beat Jenny if she attempted to protect the infant. Jenny believed Southwood was a dangerous person and she feared him. She stated that she never informed anyone about the abuse nor did she try to leave Southwood because she feared his reprisals. Although she admitted that Southwood's violent nature posed a serious threat to the child's well-being, Jenny often left the infant alone with its father. Jenny never sought medical attention for J.L.S. because she believed that the wounds and bruises were not sufficiently serious to warrant medical intervention.

Stan Kocerek, a WMCCWU case-worker, testified that he investigated the referral which led to J.L.S.'s stay in the hospital and subsequent placement in foster care. He stated that Jenny repeatedly recounted improbable causes for the child's injuries and seemed unconcerned for her child's welfare. It was Kocerek's belief that Jenny was more immediately concerned with feeding Southwood his evening meal than caring for her child.

Dr. Carllene Groves, the pediatrician caring for J.L.S., testified about the bruises and wounds which the child exhibited during the time she lived with her parents. She also recounted the different stories Jenny gave her regarding how the child came to be injured. Dr. Groves diagnosed that J.L.S. suffered from Battered Child Syndrome. The scarring and variety of bruise colors on the child indicated to her that the child had received severe repeated beatings. Additionally, there was evidence of sexual abuse. At the time she entered foster care, J.L.S. did not have any of the requisite vaccinations against childhood diseases.

The evidence clearly and convincingly supports the jury finding that Jenny knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered her child's physical or

---

1. Stanley Southwood voluntarily terminated his parental rights to J.L.S. on October 20, 1988; thus, he has no interest in this appeal.

emotional well-being. It also supports the finding that Jenny engaged in conduct or knowingly placed J.L.S. with a person who engaged in conduct which endangered her physical or emotional well-being. Jenny knew Southwood posed a serious threat to the infant's health and yet remained passive, omitting or failing to act responsibly despite her knowledge. Jenny violated her parental duty to protect her child by not trying to remove J.L.S. from her abusive father. Although Jenny did not directly cause the injuries J.L.S. sustained, the evidence shows that although necessary, she failed to appropriately care for the child's injuries and to seek professional medical treatment for the child and to take immediate steps to protect her child from further injury from the father.

 Jenny asserts that the evidence did not support a finding that termination of her parental rights was in her child's best interests. Although a strong presumption exists that it is in the child's best interest to remain in the care and custody of his natural parents, the presumption disappears when it is confronted by evidence to the contrary. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.1976); *Gonzalez v. Texas Dept. of Human Resources*, 581 S.W.2d 522, 527 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *Doria*, 747 S.W.2d at 955.

Approximately two months after Southwood's incarceration, Jenny married James Partida. The couple, along with their newborn daughter and Jenny's infant son by Southwood, established a home in a house shared with James' relatives. Throughout the time that J.L.S. was in foster care, the WMCCWU provided Jenny with extensive psychological, home-making and child-care counselling in an effort to prepare the mother and family for J.L.S.'s return.

Dr. Dorothy Wong, a WMCCWU psychologist, testified that Jenny had a dependent personality type which made her unable to care for her own day-to-day living needs. This made Jenny dependent upon others to provide her with the basic necessities of life. Dr. Wong's diagnosis was derived from several months of counselling. Wong observed that Jenny's personality type made her inattentive to her child's needs because she was preoccupied with her own needs, which always came first. Wong suggested that should Jenny's marriage to Partida end, Jenny would soon find another man to care for her, even if that man was Southwood. In Wong's professional opinion, Jenny possessed inadequate parenting abilities, she could not adequately care for more than one child at a time, and it was unlikely that she would escape this personality type even after massive amounts of counselling.

WMCCWU case-workers Sherry Kovach and Tina Jones both testified that despite continuous counselling, Jenny did not improve her home-making and child-care skills. Neither case-worker believed that Jenny would ever significantly improve these skills because she did not like being told what to do. Both believed that terminating Jenny's rights to J.L.S. was in the best interest of the child.

Jones testified that the Partida home was frequently dirty and without food and basic utility service. Jenny, James and the two children lived in one room of the residence they shared with five of James' relatives. The house had an odor, dirty clothes lay on the floor, a bucket was used as a toilet, dirty dishes went unwashed, the children's toilet chair was unclean, and there was an obvious cockroach and mouse problem. The yard was dangerous for children due to broken glass, trash, beer cans, pieces of cars, nails and wood lying about. After Jones indicated that the yard conditions were hazardous, Jenny cleaned the front yard. The back yard remained hazardous mostly due to construction of an additional room.

Kovach testified that Jenny resisted any suggestions designed to improve, among other things, family nutrition, child safety, and money budgeting skills. Even with financial aid such as food stamps, Jenny could not budget the family expenditures and purchased items the family could not afford. Furthermore, despite "massive support" from the WMCCWU and its professionals, Jenny was "nearly over-

whelmed" by the responsibility of caring for her two youngest children. Kovach frequently observed Jenny leaving her young son and daughter unattended and unsupervised for periods of time. Kovach opined that Jenny possessed a "very minimal" ability to care for and protect her children. Finally, J.L.S. and Jenny did not have an emotional bond and the child was often unhappy when she visited her mother and family at the Partida home.

Erme Waddell, another WMCCWU caseworker testified that Jenny would make improvements that Waddell suggested but that the quality of living conditions would eventually regress. Waddell also observed that Jenny "had trouble" caring for the two youngest children.

Jenny testified that although she loved J.L.S., her fear of Southwood prevented her from protecting the infant or leaving their abusive environment. She stated that she had not contacted Southwood after his imprisonment and that she had been truthful during the trial. In response to these assertions, the State introduced photographs of J.L.S. addressed to Southwood which bore a loving message in Jenny's handwriting. Also, Dr. Wong previously testified that Jenny once hitchhiked to visit Southwood in the penitentiary.

Jenny points to her young age (she was approximately 16 years old when J.L.S. was born), her sexual abuse by her stepfather, her lack of education (she did not complete high school), and her financial status (she is unemployed and receives welfare benefits) and asserts that these unfortunate circumstances combined with Southwood's threats of physical harm caused her failure to perform at that level of adequate parental behavior commensurate with modern standards.

This Court concedes that appellant experienced an unstable past. Nevertheless, the evidence clearly shows that although Jenny appreciated the danger Southwood posed to her own person, she failed to protect her infant child from that same danger. The record indicates that Jenny is unable to overcome her own problems to successfully rear her child. Furthermore,

the record establishes that she does not possess sufficient parenting skills to properly protect the child from danger and to appreciate and attend to the child's needs. The evidence clearly and convincingly supports the jury finding that terminating Jenny's rights to J.L.S. is in the child's best interest. All points of error are overruled.

The judgment of the trial court is AFFIRMED.