**Maria Magdalena GARZA, Appellant,**

v.

**TEXAS DEPARTMENT OF HUMAN SERVICES in the Interest of J.L.G. and E.G., Children, Appellee.**

**No. 13–89–394–CV.**

Court of Appeals of Texas, Corpus Christi.

June 29, 1990.

---

**4.** In fact, Westrup remained appellant's only probation officer for his entire probationary period.

Baltazar Coronado, Texas Rural Legal Aid, Inc., Harlingen, for appellant.

Yolanda De Leon, Cameron County Hall of Justice, John A. Olson, Asst. County Atty., Brownsville, for appellee.

Before NYE, C.J., and SEERDEN and KEYS, JJ.

## OPINION

NYE, Chief Justice.

Maria Magdalena Garza appeals the judgment of the trial court terminating her parental rights to E.G. and J.L.G., her minor children, and appointing the Texas Department of Human Services (TDHS) as the children's managing conservator. Appellant asserts four points of error. We affirm the judgment of the trial court.

By two points of error, appellant asserts that the trial court erred by finding that appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-beings as there

was no evidence or insufficient evidence to support such a finding. Appellant asserts by two additional points of error that the trial court erred by finding that appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-beings as there was no evidence or insufficient evidence to support that finding. *See* Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1990).

█ Termination of parental rights is of constitutional dimension and can never be justified absent the most solid and substantial of reasons. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985); *Doria v. Texas Dept. of Human Resources*, 747 S.W.2d 953, 954 (Tex.App.—Corpus Christi 1988, no writ); *Chesser v. Texas Dept. of Human Resources*, 595 S.W.2d 615, 617 (Tex. Civ.App.—Corpus Christi 1980, no writ). To terminate a parent-child relationship, each finding made by the trial court must be based on clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 746–48, 102 S.Ct. 1388, 1391–93, 71 L.Ed.2d 599 (1980); *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex.1984); Tex.Fam.Code Ann. § 11.15(b) (Vernon 1986). The clear and convincing evidence standard is that degree of proof which will produce in the mind of the trier of fact a firm conviction or belief that the allegations sought to be established are true. *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979); *Doria*, 747 S.W.2d at 954–55; Tex.Fam.Code Ann. § 11.15(c) (Vernon 1986). To terminate parental rights under Section 15.02, the State must prove that the parent committed an act or omission defined within Section 15.-02(1) and also that the termination of such

rights is in the best interest of the child. *Texas Dept. of Human Serv. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987); *Richardson*, 677 S.W.2d at 499; Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1990).

█ Appellant is an unemployed widow with a sixth grade education. When her husband died in 1980, appellant had a son, Aroldo, and a daughter, Hilda, and was pregnant with her third child, E.G. She later gave birth to her fourth child, J.L.G., who was conceived out of wedlock.[1] Aroldo and Hilda are approximately ten years older than E.G. and J.L.G. Appellant supported her family by receiving Social Security disability income for herself and E.G.; however, because J.L.G.'s father was alive, appellant did not receive any welfare benefits for her youngest child.[2]

In October, 1986, TDHS placed E.G. and J.L.G. into a foster home in response to numerous referrals of neglect. Specifically, the children's teachers complained that the children were continually late for class and that they were sleepy and listless in class, thus lowering their academic performance. Although the children qualified for the government's free breakfast program, they rarely participated in the program because they arrived several hours after it was served. The children were not clean and their clothing was often dirty and wrinkled as if they had slept in them the night before. When teachers confronted appellant with the fact that the children needed more rest to be able to learn at their optimum performance level, she explained that she was out until early morning looking for Aroldo and Hilda, her un-

1. Gumecindo Alfaro, Jr. is the biological father of J.L.G. Although Alfaro was properly served with citation and notice of this suit to terminate his parental rights, he did not respond nor did he appear at trial; thus, he waived his rights to appeal the trial court's judgment terminating all rights to his son.

2. Alfaro never supported J.L.G. economically or otherwise, and appellant never sought to adjudicate the matter to have a court determine Alfaro's paternity. The record supported the trial court's finding that the parent-child relationship between Alfaro and J.L.G. did not exist in fact or in law. The record also supports the court's

finding that Alfaro voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months, and that he failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition filed in this case, and that termination of Alfaro's parental rights to J.L.G. were in the child's best interests. Thus, the court properly terminated Alfaro's parental rights to J.L.G.

manageable and truant teenagers, and that the two younger children had to go with her as she had no one to look after them while she was out of the house.

The State produced many witnesses who testified regarding appellant's neglect of the two younger children. Their testimonies produced the following evidence, summarized below.

After the two younger children were placed in foster care, both Aroldo and Hilda were committed to the care and custody of the Texas Youth Commission because appellant was unable to control or supervise them. Both children were truants and had criminal records. Although only a junior high school student, Hilda would not remain at home, preferring to live with others where appellant could not easily confront her regarding her truancy and her lifestyle.

School personnel testified that E.G. and J.L.G. went to school dirty, listless, and hungry, that they were loners who did not socialize much with their schoolmates, and that they were continually late to school in the mornings due to appellant's having kept them out late at night looking for her wayward daughter and son. Appellant did not have a car nor did she know how to drive. Police officers often saw appellant walking the streets late at night or early in the morning with her four- and five-year-old in tow. Once, during a particularly cold evening, the police chief observed that the children were not dressed in appropriate protective garments and they had been outside all evening with appellant, looking for their brother and sister. The children missed breakfast at school because they were late and were hungry on many occasions. School personnel met with appellant to try to correct the children's situation but appellant would not keep her promises to correct the problems.

All of the State's witnesses who entered appellant's home testified that it was ill-kept and dirty, with holes in the walls and floors and with standing water in the yard. Social workers reported that, although appellant received adequate financial support to meet the needs of her family, she failed to provide adequate amounts of food for the children due to her failure and inability to budget her money.

After TDHS received referrals regarding the children, the State offered services to appellant before removing the children from their home in October 1986 and returning them in May, 1987. Even though the State developed service plans to suit appellant's needs, she failed to follow the corrective measures prescribed. The children were again removed from appellant's home in July, 1987 because appellant refused to allow social workers to enter her home, to interview the children privately, and refused to follow the advice of the homemaker assigned to help her create and maintain a proper home environment. Thereafter, the children remained in foster care up to the time of trial.

At the time they entered foster care, the children used vulgar language, lacked discipline and had been mentally abused by Aroldo and, consequently, feared him. Their foster mother testified that both children were withdrawn, "very sad", and did not want to eat. The foster mother and several social workers observed that the children did not respond lovingly towards appellant during visitations. During these visitations, appellant usually did not have anything to say to her children other than to try to coach them to say they wanted to live with her or to disobey their foster parents.

On several occasions, appellant confronted the foster parents and threatened them because they would not allow her to have an unscheduled visit with the children or to take the children away from them. She threatened to commit suicide in front of the children during one confrontation, upsetting both children. Once, as a social worker was transporting appellant to one of her scheduled visitations, appellant threatened to throw herself from the moving automobile.

Appellant was often disoriented and appeared not to understand the consequences of her actions or events around her. A psychological assessment indicated that appellant has a dependent personality disor-

der and that she has poor and immature judgment, especially in critical situations, which renders her unable to supervise or care for her children. Appellant also has a low intelligence level, although she is not mentally retarded. There is evidence that, as a child, appellant sustained a cranial injury and thereafter acted differently than she had before the injury. The psychologist testified that appellant's prognosis for recovery from her dependent personality disorder was "very very poor" because she lacked the intelligence to understand counselling and to be motivated to change.

The psychologist also stated that although appellant loved her children, she lacked sufficient judgment to be able to adequately care for them. Although appellant agreed to attend court-ordered counselling and parenting skills training, when social workers arrived to transport her to those meetings, appellant would hide from them or would not be at home. Appellant never seemed to comprehend that there were several reasons prompting the TDHS to place children in foster care. She insisted that once her brothers helped her repair the house, the children should be allowed to return. Appellant would state that she understood the information which she would receive from the social worker or homemaker, but later repeatedly asked the person what she was supposed to do. Several witnesses stated that appellant would make assertions or statements only to contradict herself moments later and deny having made the initial statement. Appellant confronted TDHS officials several times a day about returning the children to her, despite their admonitions that she must follow the advice of her services counsellors and improve all aspects of her home environment before the children would be returned.

Appellant's family was willing to help her with the children's needs, but she would not seek their help. Although appellant eventually sought relatives to receive the children into their homes, these same relatives would not accept the children. Many of the relatives felt that appellant would interfere with the care and instruction of the children should they accept responsibility for their upbringing.

The children responded well to their foster family, began interacting with schoolmates and friends, and are progressing through their respective learning levels. The children did not want to return to live with appellant; rather, they wanted her to live with them in their foster home.

■ The evidence supports the trial court's finding that appellant knowingly placed or knowingly allowed her youngest children to be exposed to conditions or surroundings which endangered their physical or emotional well-beings. Appellant's repeated forays into the night to recover her daughter from whatever real or imagined perils she wished to engage in caused the young E.G. and J.L.G. to suffer repeated exposure to the elements, lack adequate rest, and not appear for school at the proper times and in a physical state conducive to learning. Appellant lacked sufficient judgment and/or parenting skills to provide adequate and consistent nutrition for her children. As a result of these unhealthy living conditions, E.G. and J.L.G.'s physical and emotional development suffered. In short, the children could not thrive in the conditions in which their mother forced them to live.

Appellant allowed Aroldo to threaten his younger siblings. Appellant forced the children to accompany her all over town to search for Hilda and Aroldo, exposing them to potential harm from evil-doers or even passing automobiles. The children witnessed appellant's threats to kill herself. She repeatedly told them to disobey their foster parents and to demand that they be returned to her care. The evidence supports the trial court's finding that appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. All points of error are overruled.

The judgment of the trial court is AFFIRMED.