

# NUMBER 13-11-00305-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF T.N.C., C.M.C., AND J.P.C., MINOR CHILDREN

### On appeal from the 156th District Court of Live Oak County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant, F.A.C., appeals the termination of her parental rights to her three children, T.N.C., C.M.C. and J.P.C.[1] By five issues, F.A.C. contends that: (1) the evidence is legally and factually insufficient to support the trial court's finding that she violated four statutory grounds for termination; and (2) the evidence is legally and

---

[1] *See* TEX. R. APP. P. 9.8(b)(2) (providing that in a parental-rights termination case, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").

factually insufficient to support a finding that termination was in the best interest of the children. We affirm.[2]

## I.     BACKGROUND

After receiving a report alleging that F.A.C. had physically neglected T.N.C., the Texas Department of Family and Protective Services (the "Department") filed an original petition for protection of a child, for conservatorship, and for termination in a suit affecting the parent-child relationship regarding T.N.C. and J.P.C.

On March 11, 2010, the trial court entered an order for protection of a child in an emergency and notice of hearing naming the Department as the temporary sole managing conservator of the children, T.N.C. and J.P.C., and setting a hearing pursuant to section 262.201 of the Texas Family Code. On March 24, 2010, the trial court, in its temporary order following adversary hearing, ordered F.A.C. to: (1) provide child support, medical support, her medical history, and contact information of family members with whom the children may be placed; (2) attend and cooperate fully in counseling sessions, parenting classes, and appear for drug and alcohol dependency assessment; (3) comply with each requirement set out in the Department's service plan; and (4) provide, within thirty days, "information sufficient to accurately" identify her net resources and ability to pay child support, establish the parentage and immigration status of the children, to ensure that the Department has the children's medical history, the parents' current address and contact information, and required notification within five days of a change of address or phone number.[3]

---

[2] The father is not a party to this appeal.

[3] The trial court documented that F.A.C. had failed to appear at the hearing after being "duly and properly notified."

On April 20, 2010, the Department filed an amended petition for protection of a child for conservatorship, and for termination in a suit affecting the parent-child relationship, requesting that F.A.C.'s parental rights to C.M.C. be terminated. On that same day, the trial court appointed the Department temporary sole managing conservator of C.M.C. The trial court made similar orders as in its March 24 order for F.A.C. to follow with respect to C.M.C.

On February 28 and March 1, 2011, a jury trial to determine whether F.A.C.'s parental rights should be terminated was held. Upon the jury's finding that F.A.C. had violated section 161.001 subsections (D), (E), (N), and (O) and that termination was in the children's best interest, the trial court entered an order terminating F.A.C.'s parental rights as to T.N.C., J.P.C., and C.M.C. *See* TEX. FAM. CODE ANN. § 161.001(1)(A-T) (West Supp. 2010). This appeal followed.

## II. THE EVIDENCE

F.A.C. testified that she currently resides in McAllen, Texas with a friend who has four children and is working part time as a maid. F.A.C. stated that she has lived at this residence for one month; previously, she lived in the residence next door to this residence for approximately "a couple of months." Before moving to McAllen, F.A.C. lived in Edinburg on Rayburn Street "from June until 4th of July, and then [she] went back July 11th, and then [she went] back to George West [on July] 20-something." F.A.C. stated she "went back August 13th until close to Thanksgiving"; however, it is unclear where F.A.C. meant. F.A.C. testified that during the pendency of the proceedings, she has lived in six different locations and that she did not consider those living conditions to be stable.

3

F.A.C. worked at the Dairy Queen in George West when the Department's investigation began. She stated that she quit her job at Dairy Queen on approximately May 23, 2010 and she started working again in July until August 13, 2010. F.A.C. claimed that she worked at Whataburger from "the beginning of December until December 28th, and then in Edinburg at a grapefruit warehouse was [sic] December 28th to February 1st[, 2011]." According to F.A.C., she has been hired to work at the Whataburger in Elsa, Texas and will begin in a few weeks; she also has been accepted to train as a medical assistant at South Texas Vocational Institute.

F.A.C. stated that she lived in George West on Highway 281 when the Department began its investigation of neglect in January, 2010. At that time, T.N.C. and C.M.C. were attending school—T.N.C. was in kindergarten and C.M.C. was in Head Start. According to F.A.C., T.N.C. had failed kindergarten because of her truancy, and F.A.C. "went to court for it." F.A.C. claimed that T.N.C. did not want to go to school and that T.N.C. had trouble waking up and would miss the bus. F.A.C. did not have a car to drive T.N.C. to school. F.A.C. agreed that it was her responsibility to get T.N.C. to the bus on time, but she claimed that she was not home the majority of the time T.N.C. missed the bus and blamed the father. F.A.C. acknowledged that in order to "go to court for truancy there would have to be a lot of absences."

F.A.C. testified that she received calls from T.N.C.'s school regarding her hygiene and clothing. F.A.C. stated, "[T.N.C.] would urinate herself, she had a kidney and bladder infection. I would take her to the hospital, she would get treated for it. She had lice, and I would clean it, but she would get reinfested." F.A.C. agreed that when the Department began its investigation of the allegations of neglect and abuse, she

4

voluntarily placed her children outside the home with a family friend, Marta Garcia. F.A.C. stated that she thought the children were with Garcia for approximately one month; she did not recall exactly how long. F.A.C. claimed that the electricity in her home was "cut off" the same day the Department removed the children from her home. F.A.C. admitted that the Department's investigator asked her to make several improvements to the home, including, "fixing some windows and a hole in the restroom floor." F.A.C. claimed she never made these improvements because she had "a month to do it . . . [and] the kids got removed before the 30 days." F.A.C. also claimed that the father was in charge of making the improvements and that she does not know how to fix a window. F.A.C. did not believe that the Department was unreasonable for asking her to make the improvements within thirty days.

F.A.C. could not recall being ordered by the trial court to be present at an adversary hearing regarding her children. However, when asked if she remembered telling a caseworker that she was in Edinburg the day before the hearing, F.A.C. replied, "I had went, because we were buying a trailer house in Three Rivers, and they went to check the house. The floors needed to be fixed. I had gone to Edinburg to get some supplies, I ended up going to jail because I had a warrant for my arrest. I wasn't able to come to court." F.A.C. agreed that it would have been important for her to be present at the hearing.

F.A.C. identified petitioner's exhibit number 1 as a family service plan regarding her children. The trial court admitted the service plan into evidence. It states that the Department became involved in F.A.C.'s case because:

> [T.N.C.] was missing alot [sic] of school, had lice, was unkempt, smelled of urine. Parents did not send spare clothing to school as

5

requested. [T.N.C.] had recurring kidney infections. [T.N.C.] would arrive at school with no underwear or socks. [T.N.C.] and siblings were dressed inappropriately for weather. [T.N.C. was required to repeat kindergarten] due to [a] significant amount of missed school. The children were not receiving proper medical attention or having their medication properly administered. Allegations of domestic violence and substance abuse contributed to the Department seeking legal custody of the children.

The plan states that once the children are returned to the parents, the parents will "provide a learning and educational environment" by reading to the children and engaging the children in educational activities and by ensuring that the children attend school and complete any assigned homework. The Department's concerns as of April 20, 2010, related to risk and safety of the children were documented in the plan as follows:

> All three children are under the age of 5 and are unable to verbalize and protect themselves from harm. The ages of the children are 5, 4, and 2 years old. The 4 year old [C.M.C.] has a speech problem, she could not verbalize her full name or answer introductory questions. [F.A.C.] and [the] father informed the Department of her problem, and she is going to begin speech therapy at Headstart. [T.N.C.] is aggressive. She talks back and was noted to kick her caregiver. She will also resist her parent's directives. She was physically pushing her mom away when her mom was trying to put her seat belt on after [T.N.C.] verbally refused. She was also sticking the finger at her parents.

> Parents lack control over the children. The children hit their parents and talk back. Parents cannot make children get up for school. Parents can't potty train. Mom admitted drug use after kids removed.

> Children play outside inappropriately dressed for weather without supervision. Children are not given medication for pink eye, have had lice for months, need immunizations, children are dirty. Mom has left kids to go out of town, at least twice during investigation, to go with friends.

> The issues, concerns, and conditions initially bringing the children into CPS have worsen[ed] since the Department[']s involvement. The children's lack of medical attention and parent[']s inability to administer their medication; drug use; education; and physical care and condition of the children are concerns.

The home does need to be significantly organized and cleaned. A window in the house is broken and there is a hole in the bathroom floor as one enters. The child [T.N.C.] voluntarily expressed that father has hit [F.A.C.] in the mouth, more than once, and it makes [T.N.C.] feel angry and sad. The home's interior and exterior was filthy. It was impossible to determine junk or trash from items kept. The home smelled like animal urine, clothes were scattered, and the home had several hazards, such as broken windows, and holes in the floor.

[F.A.C.] does not realize the extent of neglect or minimizes the concerns. [F.A.C.] seems unmotivated because of the overwhelming socioeconomic stress. [F.A.C. and the father] have lied to [the Department]. They changed [their] story [regarding an] incident when [the] father left with kids, [F.A.C.] changed date of drug use, [and they] lied about [their] income tax return.

[F.A.C.'s and the father's] work schedules have caused them to need a babysitter. Their landlord will be babysitting. This appears to be the only person who can help this family. Most relatives live out of town. Friends and family members mentioned in town are males who can not care for the children. Parents had trouble finding placements. They claim to stick to themselves. Father reported that [F.A.C.] threatened to leave with the children.

[F.A.C.] disclosed that she wanted to go away and start over with or without the children.

The family plan also set out the goals for F.A.C. and the father as follows: (1) parents shall attend individual therapy and demonstrate an ability to support and protect their children; (2) parents will sign a release of information for all physicians, psychologists, therapists, and drug treatment centers; (3) parents shall become employed full time by May 30, 2010 in order to support themselves and the children; (4) parents shall provide verification of employment; (5) parents shall provide original birth certificates, social security cards, and immunization schedules for T.N.C., J.P.C., and C.M.C.; (6) parents shall notify the Department within five days of a change of address and phone number; (7) parents "shall actively participate in services provided by the Department as well as services obtained through referrals"; (8) parents shall complete a

7

drug assessment; (9) "Parents shall participate in supervised visitations by the Department and demonstrate learned parenting skills as arranged through the Department"; (10) "Parents shall provide and maintain appropriate housing that is free of health and safety hazards" with working utilities, access to a telephone for emergency purposes, adequate food, medical care, and clothing for the children; (11) parents shall provide the Department with proof of appropriate housing and working utilities by May 30, 2010; (12) parents shall pay child support; (13) parents shall participate in random drug testing with negative results; (14) parents shall attend and complete parenting classes; (15) parents shall make an appointment with "MHMR" and attend recommended services; (16) parents shall provide complete medical history of themselves and the children; and (17) parents shall undergo psychological testing. The Department's task/service included monitoring and supporting the parents with completing designated tasks to facilitate family reunification. F.A.C. signed the plan on May 11, 2010 acknowledging that she understood that the family plan "is a very important document" and that if she was unable or unwilling to provide her children with a safe environment, her parental rights may be terminated, and that a court hearing would be held to review the family service plan.[4]

F.A.C. stated that she was supposed to follow the service plan and that it documented the services she was ordered to complete. F.A.C. claimed that she attended individual therapy in Edinburg; however, she stated that she did not have any

---

[4] In a May 12, 2010 status hearing order, admitted as petitioner's exhibit number 2, the trial court ordered that "the permanency plans and recommendations for the children, set out in the service plans filed with the Court, are approved and adopted by the Court as if set out verbatim in this order."

8

documentation proving that she did so.[5]  F.A.C. testified that she attended three counseling sessions; then she stated that she could not remember.  When asked if she complied with the requirement that she notify the Department of any address or telephone changes within five days, F.A.C. replied, "Yes, sir, but not within five days."  When asked if the Department was able to contact her by phone when necessary, F.A.C. responded, "Sometimes."  When asked if she complied with the requirement that she participate in supervised visitations with the children, F.A.C. said, "At first, yes, and then after I moved, not that often.  I went—after I moved I got to see them in June around [T.N.C.'s] birthday. . . ."  F.A.C. stated that she visited the children three or four times between July and December 2010 and that she had visited the children twice between December 2010 and February 28, 2011.  According to F.A.C., her visitation with the children was "[s]upposed to be every Tuesday, but [she] cancelled for every other Tuesday, but because of [her] job, because [she] was working at the time, [she] couldn't come."  Regarding whether she had provided and maintained appropriate housing, F.A.C. stated she had because for the past month, she has lived with a "lady" and that they were renting a house together and splitting the bills since February 14, 2011.[6]  F.A.C. claimed that she had paid child support when she started working at Whataburger in December 2010.  F.A.C. testified that although she was behind in the payments by three months in December, she had caught up on her child support payments.[7]  However, F.A.C. then stated that she had not paid child support from "when

_____

[5] We note that the service plan required F.A.C. to complete individual therapy at Spoudazo Resources of South Texas.

[6] At the time of the trial on February 28, 2011, F.A.C. had been living in this home for less than a month.

[7] The trial court admitted defense exhibit 1 showing that child support payments had been

9

[she] recently got unemployed until now it hasn't been paid." F.A.C. admitted that she had only participated in the random drug testing twice since April 2010 and claimed that she had completed parenting class. When asked if she had demonstrated knowledge of appropriate parenting skills, F.A.C. replied, "I feel I'm ready to demonstrate the skill for my children." F.A.C. admitted that she had failed to complete psychological testing and that she had not completed all the requirements of the service plan.

F.A.C. testified that her plans for the children included sending them to school, and "bettering [herself] to provide a better life for them. . . ." F.A.C.'s residence has two bedrooms and a "big living room" that can be converted into a bedroom. F.A.C. has a roommate and the children will either sleep in one of the bedrooms or in the living room, once it's converted into a bedroom. F.A.C. testified that her roommate has four children—two boys and two girls ages, 14, 13, 12, and 10. F.A.C. believed that she would be able to get the children to school on time because the school is only one block away from her residence.

On cross-examination by the children's attorney ad litem, F.A.C. stated that personnel from T.N.C.'s school had complained about T.N.C. going to school without socks, but denied any knowledge of T.N.C. attending school without underwear. F.A.C. blamed the sock incident on the father and claimed she was not present and that he could not find any clean clothes for T.N.C. to wear. F.A.C. acknowledged that the school had been complaining about the head lice since the beginning of the school year. F.A.C. testified that she was aware of the date of the adversarial hearing but still

deducted from F.A.C.'s salary on December 27, 2010 in the amount of $56.81, on January 3, 2011 in the amount of $64.85, on January 10, 2011 in the amount of $64.85, on January 14, 2011 in the amount of $85.38, on January 28, 2011 in the amount of $68.82, and on February 4, 2011 in the amount of $82.77.

10

chose to go to Edinburg the day before the hearing. F.A.C. agreed that she told her caseworker about using cocaine because the caseworker was about to perform a drug test on her. F.A.C. did not remember if she had a cell phone showing missed calls from her caseworker. F.A.C. stated that she has had four or five phone numbers since the children's removal. F.A.C. testified that although she had attended three counseling sessions, she was unable to complete the program because she "kept calling to reschedule and he never answered my call." F.A.C. acknowledged that her counselor had not released her from the program. F.A.C. stated that she knew that her children were in foster care "in this area" when she moved to Edinburg on May 23, 2010 and still made the decision to move. F.A.C. agreed that she had not appeared at two subsequent hearings, claiming that she "didn't have a vehicle, and no employment for [sic] to get money to come on the bus." F.A.C. acknowledged that she understood the terms and the tasks she was required to perform under the service plan.

On direct examination by her trial counsel, F.A.C. claimed that she took care of T.N.C.'s lice problem and that the school nurse told her she was doing a good job at controlling the problem. F.A.C. blamed T.N.C.'s urinary tract infection on the fact that T.N.C. would wait to the last moment to urinate and stated that "Until this day she still does that." F.A.C. testified that her visitation was scheduled to occur in Beeville, Texas and that it takes approximately three hours to travel to Beeville from Edinburg. F.A.C. claimed that the trip was very difficult for her to make because she was working at a warehouse and she would have been terminated if she asked for time off. When asked if she had attempted to meet with the psychologist, F.A.C. responded, "Once, yes." F.A.C. stated that she was unable to "go all the way to Corpus" for the appointment and

11

"they couldn't make arrangements for it to be done in Edinburg." F.A.C. testified that the service plan was inaccurate because it stated that she had not completed any of the tasks and that she had completed some.

On redirect examination, F.A.C. stated that she "sometimes" thought it might have been better for her to have stayed in George West to be closer to her children and that it would have made it easier to visit her children. F.A.C. did not believe that it would have been easier to complete her service plan, however, because her former employer would not have given her time off. F.A.C. stated that she thought that moving to the Rio Grande Valley was good for her children because she had "better opportunities" in the Valley. F.A.C. denied that domestic violence occurred when she was living with the father and that she never told any investigators that domestic violence had occurred. F.A.C. acknowledged that she called the police when she found the words "I love you" written in blood in her living room and that her children were missing.

Pam Johnson, T.N.C.'s kindergarten teacher, testified that when T.N.C. started class, her level of education was "below what a normal kindergarten student comes to school with. She didn't know her colors, her numbers, she didn't know T was the first letter in her name. . . ." Johnson stated that typically, a child in kindergarten knows the letters of their first name, knows how to write their first name, knows their first and last name, and knows how old they are. Johnson claimed that when they asked T.N.C. how old she was, T.N.C. did not state the correct age and that T.N.C. did not know her first and last name. T.N.C. also did not know her siblings' names. Johnson stated that T.N.C. had very poor attendance and that on one occasion when T.N.C. missed the bus, a "Mr. James" picked T.N.C. up and brought her to school. Johnson said, "In the

12

20 years I've been teaching, [T.N.C.] came to school as the lowest student I've ever seen."

Regarding T.N.C.'s hygiene, Johnson explained:

> Her hygiene was lacking. Her hair was normally dirty with bugs, she had an odor about her from what we discovered was urinary tract infections. On a cold day she'd come in sleeveless shirt, no jacket. Sometimes when she did come with a jacket the jacket was very filthy. So we had issues with that.

Johnson testified that T.N.C. "smelled pretty strong" with the scent of urine on some mornings, and Johnson sent her to the school nurse on those occasions.

Johnson testified that T.N.C. had twenty-eight absences and was present sixty-one days. Johnson stated that T.N.C. did not have any major behavior problems, but she recalled that T.N.C. may have been "off task." Johnson attributed this issue to T.N.C.'s home environment.

Debbie Riddle, the nurse at T.N.C.'s school, testified that she had contact with T.N.C. quite often due to the bugs in her hair. Riddle stated that T.N.C. had "lots of bugs." According to Riddle, F.A.C. was the primary caregiver and she assisted F.A.C. with the treatment of the lice. When asked if the lice were ever completely treated, Riddle replied, "At times. It was like when I would tell them to clean it up they would for maybe a day or two, and then here we go again. She'd have it again three or four days, and here we go again, next week it was the same old thing. They just wouldn't stay on top of it." Riddle did not believe it was "normal" for the lice to reoccur and blamed the parents. On cross-examination by the children's attorney ad litem, Riddle stated that the recurring lice problem was a result of "the parents [not] properly clean[ing] the child,

they don't get all the eggs out that are left in there that will hatch and start all over again. They just need to stay on top of it."

Riddle stated that T.N.C. had "an odor about her" that Riddle believed to be due to a urinary tract infection. Riddle discussed the issue with F.A.C. and thought that it had been addressed; however, the infection kept reoccurring. Riddle stated that it was not normal for a child T.N.C.'s age to have such an infection and that the parents would need to take the child to the doctor.

Veronica Molina testified that she is an investigator with the Department and that she conducted an investigation involving F.A.C. based on allegations of physical neglect of T.N.C. and concern for unknown siblings. Molina visited the children on January 24, 2010 at F.A.C.'s home in George West. Molina said:

> Initially it was a very cold day and the children were running around outside with sundresses, like spaghetti-strapped dresses, and they had no shoes on. [T.N.C.] was running around with a blanket and was shivering. The three-year-old [J.P.C.] was just in a diaper, no shirt, no shoes, no pants outside. All three of the children had dried snot on their nose and under their eyes; and [T.N.C.] and [C.M.C.] had pink eye.

F.A.C. was not present, but when she arrived, Molina discussed her concerns about the children's attire with her; however, F.A.C. did not change the children's clothes. Molina testified that the children were sent to school with pink eye and that F.A.C. told her she did not have money to buy any medicine or take them to the doctor. Therefore, the children's pink eye was not being treated.

Molina stated that T.N.C. made an outcry of domestic violence by telling her that when her parents are mad, "Dad hits Mommy, Dad has hit Mommy in the face" and that had occurred on more than one occasion. T.N.C. told Molina that she felt angry when her father hit F.A.C. According to Molina, T.N.C. claimed that when she is punished,

14

she gets "an ass whipping." Molina explained that she then asked the parents to provide the following safety measures: (1) appropriately dress the children for the weather; (2) provide proper medical attention for the children's pink eye, address the lice, and the urinary tract infection; and (3) refrain from any domestic violence in the home.

Four days after Molina's meeting with the parents, F.A.C. called Molina and informed her that the father had taken the children out of the home to Buda, Texas after writing "I love you" in blood on the living room wall. F.A.C. reported the incident to the police department; Molina stated that she confirmed the report with the police department. On that day, Molina asked F.A.C. to voluntarily place the children out of the home because Molina discovered that the home was cold and did not have electricity, cats were "left unkempt" in the home and seemed "to be living in the home without being cleaned up after," and the home "smelled like animals."

Molina confirmed that the children were with the father and when the father and the children returned to George West, the children were removed from F.A.C.'s home and placed with Garcia on January 28, 2010. While the children stayed with Garcia, Molina asked the parents to do the following: (1) turn on the electricity; (2) clean the home; and (3) fix the safety hazards including the broken windows in the home and the "big hole" in the bathroom floor. On February 19, 2010, the Department received notice that Garcia "had been disciplining [T.N.C.] at school in front of others, and [Garcia] made a threat of violence to the school saying she was going to get her gun and go shoot up the school and shoot up the parents and C.P.S. people because she was

15

frustrated that she was unable to go to work because she was having to take the children to the doctor."

The children were removed from Garcia's home on March 10, 2010, and the parents were asked to provide another placement for them. T.N.C. and J.P.C. were placed in the father's aunt's home in Buda and C.M.C. was placed with F.A.C.'s grandmother. Molina testified that the placement for T.N.C. and J.P.C. was not appropriate due to the conditions of the home—"it was not a good fit for them because the environment was not very clean and [Molina] noticed hazards."[8] Molina stated that the Department's intent at this point was to work with the family, and the Department gave F.A.C. more time to find alternative placement for T.N.C. and J.P.C.; however, the placement "broke down anyway" and the Department had to remove the children. C.M.C stayed in her placement; however, that placement also eventually "broke down."

Molina testified that when the children were removed, she was unable to contact F.A.C. and the parents for other possible placements because F.A.C. no longer lived at the address in the Department's records and "no one knew where she was." Molina said, "I made all efforts to try to contact the mother and father to try to get placement. Unfortunately that could not be done on time until after we removed." According to Molina, she became aware that F.A.C. spent time out of town in February or March and that when she made contact with F.A.C. during that time period, F.A.C. was either in Houston, Edinburg, or Buda. Molina stated, "She was around, not locally where I could keep in contact with her to work with her." Molina testified that, based on her

---

[8] On cross-examination, Molina explained, "Some of the rooms in the home didn't have electricity, so it was nighttime, so we really couldn't get a good look at the house on how it looked in the daytime. The outside had a lot of debris like I would say material just scattered throughout the property. . . . At the time we didn't feel it was good for permanent placement throughout this working with mom."

16

conversations with F.A.C., it appeared to her that F.A.C. was aware of the tasks in the service plan.

Sara Bridge, a conservatorship supervisor with the Department, testified that she supervises caseworkers and administrative staff and that her "stage of service deals with families once the children have actually been removed . . . ." She "handle[s] the court hearing, the services to the family" and monitors the foster or relative placements, and "basically, keep[s] tabs on the entire case for approximately a year." Bridge had been working on F.A.C.'s case since March 24, 2010.

Bridge stated that F.A.C. had not completed her service plan and was lacking the following: (1) completion of individual counseling; (2) providing the children's original birth certificates, social security cards, and immunization records; (3) failing to provide "up-to-date" phone numbers and addresses throughout the pendency of the case; and (4) failing to attend supervised visitation with the children. Bridge also testified that F.A.C. had made six child support payments since December 17, 2010 but that prior to that, F.A.C. had not made any child support payments and had a balance of $1,978.18. Regarding visitation, Bridge said, "The visitation is sporadic. She attended the first five to six visits starting April 1st [2010], and then she didn't visit again until I believe August [2010], and then the next visit wasn't until December 8th, [2010], and then the next wasn't until January 25th, 2011. August 5th and August 12th." According to Bridge, F.A.C. attended ten visitations with her children and missed thirty-four. Bridge testified that F.A.C. was admonished by the trial court that failure to cooperate with the service plan could be a ground for termination of her parental rights. Bridge identified

petitioner's exhibit number 2 as the trial court's status hearing order wherein "the family service plan was adopted and became a court order."

Bridge acknowledged that F.A.C. completed the drug assessment but stated that F.A.C had not completed the psychological evaluation. Bridge testified that two appointments were made for F.A.C.'s psychological examination but that F.A.C. failed to report to either because she was in the Valley at the time. Bridge said, "Two letters that were mailed out were mailed to I guess a previous address right before she moved to a new address. They were being returned to the Department and the doctor's office." Bridge agreed that F.A.C. did not have a stable home environment and stated,

> I can count at least nine addresses that we are aware of, living with the father, the grandfather of the children, to living with a boyfriend; that's coming out of counselor's notes. She's actually living with a boyfriend and she moves from that home to a friend's home. So there has been multiple addresses that I'm not even aware of the actual physical address. I just am told she was living there.

Bridge did not believe that was a proper living environment for the children.

According to Bridge, the children are now "completely caught up on all their medicals and dentals." Bridge testified that when T.N.C. was removed from F.A.C.'s care, T.N.C. had a urinary tract infection that has been treated and "within a month her head lice, her urinary tract infection and the pink eye had been completely cleared up."[9] Bridge stated that those problems have not reoccurred. Bridge said, "Since being placed in a foster home she's not had any accidents at school, urinations, she hasn't had any problems with wetting herself." Regarding T.N.C.'s development, Bridge stated:

---

[9] On cross-examination, Bridge stated that F.A.C. had reported that she saw lice on T.N.C. at a visitation on August 12, 2010. However, according to Bridge there is no evidence that T.N.C. actually had lice and the foster parents took T.N.C. to the doctor and nothing was found.

> She was extremely delayed when she came into care. She actually had to be retained in kindergarten, she had to repeat kindergarten this year because she was so behind. She is doing well. She knows her colors, her numbers, she can write her name, she's helping with writing—each year they write books, and she writes her paragraph for the book. She's doing very well. She had some patches where she wasn't retaining information, but the repetitiveness of the school being put into after school programs has really helped her. She's really improved.

Bridge testified that there were "no problems" with C.M.C. and J.P.C.; however, C.M.C. does have a speech impediment, and she is receiving speech therapy. Both children are also receiving individual counseling due to problems with aggression.

Bridge stated that the permanency plan for the children is termination of the parental rights and non-relative adoption. The Department contacted the father's fifteen siblings and none are able to care for the children. Bridge did not believe that F.A.C. has shown that she is capable of caring for the children and that the Department has made every reasonable effort to return the children to her. In Bridge's opinion, termination of F.A.C.'s parental rights was in the children's best interest.

### III.    APPLICABLE LAW AND STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847

19

(Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied); *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 57 (Tex. App.— Corpus Christi 2003, no pet.).

Before terminating the parent-child relationship, the trial court must find that the parent committed one of the acts prohibited by section 161.001(1)(A-T) of the Texas Family Code and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1)(A-T); *id.* § 153.002 (West 2008); *In re J.L.*, 163 S.W.3d at 84. A parent violates section 161.001(1) if she does, among other things, the following: (1) "knowingly place[s] or knowingly allow[s] the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]," TEX. FAM. CODE ANN. § 161.001(1)(D); (2) "engage[s] in conduct or knowingly place[s] the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]," *id.* at § 161.001(1)(E); (3) fails to "comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child[ren] who [have] been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child[ren]'s removal from the parent under Chapter 262 for the abuse or neglect of the child[ren]," *id.* § 161.001(1)(O); or (4) "constructively abandon[s] the child[ren] who [have] been in the permanent or temporary managing conservatorship of the [Department] for not less than six months," the Department "has made reasonable efforts to return the child[ren] to the parent," who "has not regularly visited or maintained significant contact with the child[ren]," and who "has demonstrated an inability to provide the child[ren] with a safe environment," *id.* § 161.001(1)(N).

20

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *In re D.S.P.*, 210 S.W.3d at 778. We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *In re J.L.*, 163 S.W.3d at 85. We must also disregard all evidence that a reasonable fact-finder could have disbelieved or found to be incredible. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. "If [an appellate court] determines that no reasonable fact-finders could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the "disputed evidence is such that a reasonable fact[-]finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

## IV.    DISCUSSION

By her first four issues, F.A.C. contends that the evidence is legally and factually insufficient to prove by clear and convincing evidence that she violated section 161.001(1) of the family code by:   (1) knowingly placing or knowingly allowing the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) engaging in conduct or knowingly placing the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; (3) constructively abandoning her children as set out in section 161.001(1)(N); and (4) failing to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who were in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from her under chapter 262 for abuse or neglect of the children.   *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (N), (O).

As a preliminary matter, the Department argues that F.A.C. has failed to preserve her factual sufficiency challenge to the jury's findings because she did not file a motion for new trial with the trial court as required by rule of civil procedure 324(b)(2).  TEX. R. CIV. P. 324(b)(2).  We agree with the Department.

A motion for new trial is required in order to preserve a complaint that the evidence is factually insufficient to support a jury finding.  *Id.*; *Cecil v. Smith*, 804 S.W.2d 509, 511–12 (Tex. 1991); *In re I.V.*, 61 S.W.3d 789, 794 (Tex. App.—Corpus Christi 2001, no pet.), *disapproved on other grounds, In re J.F.C.*, 96 S.W.3d at 267 n.39 (holding that the appellant waived her factual insufficiency complaint by not filing a

22

motion for new trial); *see In re M.S.*, 115 S.W.3d 534, 546 (Tex. 2003) (acknowledging that the appellant's factual sufficiency complaint had been waived because of trial counsel's failure to file a motion for new trial). Accordingly, we conclude that F.A.C. has not preserved her factual sufficiency complaints, and we will not address those issues.[10] *See* TEX. R. CIV. P. 324; *Cecil*, 804 S.W.2d at 510; *In re I.V.*, 61 S.W.3d at 794; *see also In re M.S.*, 115 S.W.3d at 546.

## A. Violation of Section 161.001(1)(O)

By her fourth issue, F.A.C. contends that the evidence was legally and factually insufficient to support the jury's finding that she violated section 161.001(1)(O). The record shows that after a hearing, the trial court appointed the Department as the children's temporary managing conservator and ordered both parents to comply with each provision of the court order, which set out the actions necessary for the parents to avoid the restriction or termination of their parental rights. At the time of trial on February 28 and March 1, 2011, the children had been in the managing conservatorship of the Department for nearly one year.

The testimony at trial showed that F.A.C. had failed to comply with the provisions of the trial court's order. F.A.C. concedes that the children were in the custody of the Department for the nine-month period preceding trial and that she did not comply with all the requirements of the service plan as ordered by the trial court. However, F.A.C. generally asserts that there was no evidence that the children were removed for abuse or neglect. F.A.C. then maintains that it was impossible for her to comply with all of the

---

[10] F.A.C. does not contend that her trial counsel was ineffective by failing to file a motion for new trial. Furthermore, in the context of ineffective assistance of counsel analysis, "when a motion for new trial is not filed in a case, the rebuttable presumption is that it was considered by the appellant and rejected." *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003).

23

requirements of the service plan for various reasons, including that she moved to the Valley and the distance was too great for her to comply, the appointments for her psychological evaluation were not in the Valley, and the Department knew that F.A.C. lived in the Valley and they failed to transfer any of the services to the Valley or to help her make travel arrangements to comply with the service plan. Finally, F.A.C. argues that she did complete some of the requirements of the service plan.

Evidence was presented that the Department became involved in this case after a report that T.N.C. was missing school, had lice, was unkempt, and smelled of urine. F.A.C. and the father failed to send clothes to school when requested. T.N.C. suffered from a recurring urinary and kidney infection. T.N.C. and C.M.C. were suffering from pink eye that had not been treated because F.A.C. claimed she could not afford to take them to the doctor's office or buy them medicine. There was evidence that the children were not receiving proper medical attention or having their medication properly administered. There was also evidence that domestic violence occurred in the home. There was evidence that F.A.C. and the father were unable to wake the children up for school and unable to potty train the children.

When Molina went to F.A.C.'s home, she found the children outside, unsupervised, and dressed inappropriately for the cold weather. J.P.C. was in his underwear and was not wearing shoes in the cold weather. The evidence showed that the home where the children lived with F.A.C. was filthy and needed to be significantly organized and cleaned. There were broken windows in the home that F.A.C. stated she was unable to fix and a huge hole in the floor in the bathroom. The home did not have any electricity and smelled like animal urine. F.A.C. disclosed that she intended to "go

24

away and start over" with or without her children; and, on May 23, 2010, after the children were removed from her home, she quit her job and moved three hours away to Edinburg without her children, who stayed in foster care. Finally, while the children were in the Department's custody, F.A.C. failed to provide her address and phone number to the Department and only visited the children ten times while missing thirty-four visits.

Molina testified that she attempted to contact F.A.C. and the father by phone to discuss other relative placements on March 10, 2010, but Molina was unable to reach them. Molina attempted to contact F.A.C. at the Dairy Queen where F.A.C. was employed; but no one there knew F.A.C.'s whereabouts. The Department was unable to locate or contact F.A.C. and, based on the evidence presented, the jury may have inferred that the Department was unsuccessful in contacting F.A.C. only because she failed to inform the Department of her whereabouts.

Molina stated that she had a cell phone number for F.A.C. and that she left numerous messages on the voice mail, but she did not "hear from" F.A.C. before the first adversarial hearing. F.A.C. did not attend the adversarial hearing. F.A.C. admitted that she also missed two subsequent hearings regarding her children. Although she claimed she did notify the Department of her change of addresses and phone numbers, F.A.C. admitted that she did not notify the Department within five days as ordered. F.A.C. testified that she has lived at six different locations and had four or five phone numbers since the children had been removed. Bridge stated that she heard from others that F.A.C. had been living in at least nine different locations; however, F.A.C. did not inform the Department of those locations.

Viewing the evidence in the light most favorable to an affirmative finding under section 161.001(1)(O), we conclude that there was sufficiently clear and convincing evidence presented to allow a reasonable fact-finder to form a firm belief or conviction that the children were removed from F.A.C. due to neglect. *See In the Interest of A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (finding that the evidence was legally and factually sufficient to support the finding that the child had been removed for abuse or neglect due to the mother's "lack of effort to locate her child following her release from [police] custody" and failure to provide her contact information with the Department); *see also In re K.H.*, No. 12-05-00077-CV, 2006 Tex. App. LEXIS 9661, at *14 (Tex. App.—Tyler Nov. 8, 2006, no pet.) (mem. op.) (stating that evidence was sufficient to show children were removed due to neglect because an investigator with the Department testified that the case was "initiated because of domestic violence in the home and physical neglect of both children"); *In re A.C.*, No. 12-04-00264-CV, 2005 Tex. App. LEXIS 8137, at *12 (Tex. App.—Tyler Sept. 30, 2005, no pet.) (mem. op.) (concluding that evidence was sufficient that child was removed due to neglect where the Department stated "that there was 'reason to believe' a report alleging neglectful supervision and physical neglect of both children by the parents" and the Department's specialist testified at trial that she "believed the children were endangered or at risk because of alleged drug use and the lack of appropriate housing"); *In the Interest of M.B.*, No. 07-04-0334-CV, 2004 Tex. App. LEXIS 11209, at **7–8 (Tex. App.—Amarillo Dec. 14, 2004, no pet.) (mem. op.) (finding that evidence was sufficient where parents failed to notify hospital of their whereabouts and after removal of the child failed to visit the child).

Next, F.A.C. argues she completed some of the requirements and that it was impossible for her to comply with all of the requirements of the service plan. Section 161.001(1)(O) states that termination may be based on a parent's failure to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children. However, section 161.001 does not have a provision that allows a parent to provide excuses for failing to complete the court-ordered services. *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied). In addition, substantial compliance is not enough to avoid a termination finding under section 161.001(1)(O). *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting that courts in Texas have refused to find that substantial compliance with provisions of court order are adequate to avoid termination finding under subsection (O)); *see also In re D.L.H.*, No. 04-04-00876-CV, 2005 Tex. App. LEXIS 9288, at *2 (Tex. App.—San Antonio Nov. 9, 2005, no pet.) (mem. op.) (rejecting the parents' arguments that substantial compliance with section 161.001(1)(O) excused their non-compliance).

Here, the court order specifically established the actions necessary for F.A.C. to obtain the return of the children. Furthermore, at trial, evidence was presented that although ordered to do so, F.A.C. failed to (1) attend individual therapy, (2) submit to a psychological evaluation, (3) become fully employed in order to support the children, (4) provide the children's original birth certificates, social security cards, and immunization records to the Department, (5) notify the Department of her numerous address and phone number changes, (6) participate in supervised visitations with the children, (7)

27

provide and maintain appropriate housing free of health and safety hazards,[11] and (8) pay child support. F.A.C., herself, admitted at trial that she had not: (1) completed the individual counseling and had only attended three sessions even though she had not been released by the therapist; (2) provided the children's birth certificates to the Department; (3) attended her scheduled visitations with the children; and (4) completed her psychological evaluation. Finally, there was evidence that F.A.C. did not obtain full-time gainful employment as ordered by the trial court. F.A.C. stated that at the time of trial, she was not employed full time and was only cleaning houses part time. Thus, viewing the evidence in the light most favorable to an affirmative finding under section 161.001(1)(O), we conclude that there was sufficiently clear and convincing evidence presented allowing a reasonable fact-finder to form a firm belief or conviction that F.A.C. failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children. Accordingly, the evidence is legally sufficient to support the jury's finding under section 161.001(1)(O).[12] We overrule F.A.C.'s fourth issue.

## B. Violation of Section 161.001(1)(N)

Although the Department only had to prove that F.A.C. committed one violation of section 161.001, there was also sufficient evidence that F.A.C. also violated section 161.001(1)(N) as explained below. Section 161.001(1)(N) sets out that constructive abandonment of the children occurs if: (1) the children had been in the permanent or

---

[11] We note that although F.A.C. claimed that she was living in what she considered appropriate housing, the jury was free to disbelieve her bald assertions.

[12] In light of our disposition of F.A.C.'s fourth issue, we need not address her first, second, and third issues. *See* TEX. R. APP. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.) (stating that a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination).

temporary managing conservatorship of the State for not less than six months; (2) the State has made reasonable efforts to return the children to the parent; (3) the parent has not regularly visited or maintained significant contact with the children; and (4) the parent has demonstrated an inability to provide the children with a safe environment. *See* TEX. FAM. CODE ANN. § 161.001(1)(N). By her third issue, F.A.C. only argues that the evidence was insufficient to prove that the Department made reasonable efforts to return the children to her and that she did not regularly visit or maintain significant contact with the children. *See id.* F.A.C. does not challenge the first and fourth prongs of section 161.001(1)(N). *See id.*

Here, the Department created and administered a service plan for F.A.C. to follow with the specific goal of reunification. The service plan stated that the Department's task/service included monitoring and supporting the parents with completing designated tasks to facilitate family reunification. The evidence showed that the Department made numerous attempts to assist F.A.C. with completing her service plan, but that F.A.C. chose to move three hours away from her children and not inform the Department of her address.

In order to be reunited with her children, F.A.C. was required to follow and complete the tasks in the service plan. F.A.C. testified that she understood the terms of the service plan. Molina testified that the Department's goal was to work with the family and that she made "all efforts to try and contact" F.A.C. regarding the children. Moreover, Bridge testified that she informed F.A.C. that failure to complete the service plan could result in termination of her parental rights.

29

Regarding visitation, Bridge testified that F.A.C.'s visitation with the children was "sporadic." F.A.C. admitted that she did not attend the scheduled visitations with her children. The jury heard evidence that F.A.C. only attended ten scheduled visitations with her children and missed thirty-four of those visits. *See In re D.S.A.*, 113 S.W.3d 567, 573–74 (Tex. App.—Amarillo 2003, no pet.) (concluding that the evidence was legally and factually sufficient to support a finding that the Department made reasonable efforts to return the child to his incarcerated father but that father failed to attend visitation and made minimal efforts to complete his service plan); *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (finding that the State made reasonable efforts to return the child to the parent by preparing several service plans designed to "help" the mother, but that the mother failed to complete any of the services); *see also In re D.A.*, No. 02-09-00460-CV, 2010 Tex. App. LEXIS 7676, at *8 (Tex. App.—Fort Worth Sept. 16, 2010, no pet.) (mem. op.) ("Returning a child to a parent under section 161.001(1)(N) does not necessarily mean that the child has to be physically delivered to the individual. '[R]easonable efforts' to reunite parent and child can be satisfied through the preparation and administration of a service plan.") (internal citations omitted). Finally, Bridge testified that "every reasonable effort was made to return the children to" F.A.C. Thus, viewing the evidence in the light most favorable to an affirmative finding under section 161.001(1)(N), we conclude that there was sufficiently clear and convincing evidence presented to allow a reasonable fact-finder to form a firm belief or conviction that the Department made reasonable efforts to return the children to F.A.C. and that F.A.C. did not regularly visit or maintain significant contact with the children. Accordingly, the evidence was legally sufficient to support the

30

jury's finding that F.A.C. violated section 161.001(1)(N).  We overrule F.A.C.'s third issue.

## C.    Best Interest

By her final issue, F.A.C. contends that the evidence was legally insufficient to support the jury's finding that termination was in the children's best interest.  F.A.C. argues that Molina's testimony that termination was in the children's best interest was not sufficient because Molina failed to articulate any facts or reasons to substantiate her belief.  F.A.C. also complains that the Department did not offer evidence establishing the wishes or desires of the children, the emotional and physical needs of the children now and in the future, the physical or emotional danger to the children now and in the future, her parenting skills, or her acts or omissions that may indicate that the existing parent-child relationship is not a proper one.

When considering whether parental termination is in the child's best interest, the following non-exhaustive list of factors should be considered:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).  The party seeking parental termination is not required to prove all nine factors.  *In re C.H.*, 89 S.W.3d at 27 (providing that these considerations

are not exhaustive, "or that *all* such considerations must be proved as a condition precedent to parental termination") (emphasis in original); *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App—Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.").

Although there is a strong presumption that it is in the child's best interest to allow the natural parent to retain custody, when confronted with evidence to the contrary, that presumption disappears. *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.— San Antonio 2003, no pet.). Evidence proving one or more of the statutory grounds for termination may be probative in determining that termination is in the best interest of the child. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.–Houston [1st Dist.] 2008, pet. denied). A best-interest analysis may be based on direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence as a whole. *In the Interest of T.N.*, 180 S.W.3d 376, 384 (Tex. App.—Amarillo 2005, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.)). "A parent's unstable lifestyle, lack of income, and lack of a home may also be considered in a determination of a parent's ability to provide for a child's emotional and physical needs and may also threaten the physical well being of the child." *Id.*

Here, the children were too young to express their wishes or desires. However, the evidence showed that while living with F.A.C., the children lacked proper hygiene and were not provided medical care; in the Department's care, the children were healthy, clean, and up-to-date on all of their medical needs. T.N.C.'s lice and urinary tract infection, which were chronic while she lived with F.A.C., were taken care of and

did not reoccur while in the Department's care. Also, T.N.C. was academically behind other children her age; however, once in the Department's care, T.N.C. was "doing well" academically.

Concerning the physical and emotional needs of the children now and in the future, the evidence established that while in F.A.C.'s care, the children were not provided with appropriate medical care. F.A.C. told the Department that she could not afford to buy medicine for the children or take them to the doctor's office. Once the children were removed from F.A.C.'s care, the evidence showed that T.N.C.'s recurring urinary tract infection ceased, she no longer suffered from lice, and the children received appropriate medical and dental care. Therefore, the jury could have reasonably inferred that the children's physical needs now and in the future were better served by the Department rather than by F.A.C. Moreover, there was evidence that F.A.C. failed to complete many of the requirements of the service plan, including failing to visit the children as scheduled. This allowed the jury to infer that F.A.C. did not provide for the children's emotional needs while they were in the Department's care.

Regarding the emotional and physical danger to the children now and in the future, the jury found that F.A.C. constructively abandoned her children, and that F.A.C. did not provide proper care for the children before they were removed. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) ("[A] parent's inability to provide adequate care for the child, lack of parenting skills, poor judgment, and repeated instances of immoral conduct may also be considered when looking at best interest.") (citing *Garza v. Tex. Dep't of Human Servs.*, 794 S.W.2d 521, 525 (Tex. App.—Corpus Christi 1990, no writ); *Sanchez v. Tex. Dep't of Human Res.*, 581 S.W.2d

260, 265–66 (Tex. Civ. App.—Corpus Christi 1979, no writ); *Coleman v. Tex. Dep't of Pub. Welfare*, 562 S.W.2d 554, 557 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.); *D.F. v. State*, 525 S.W.2d 933, 940 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (op. on reh'g); *Magallon v. State*, 523 S.W.2d 477, 479 (Tex. Civ. App.—Houston [1st Dist.] 1975, no writ)). F.A.C. allowed the children to go to school with inadequate clothing, and to play outside in the cold weather in inappropriate attire. F.A.C. did not treat the children's medical conditions, including T.N.C.'s and C.M.C.'s pink eye and T.N.C.'s urinary tract infection and lice. F.A.C. claimed she could not provide proper medical treatment for the children. There was evidence that F.A.C. allowed the children to live in unsanitary and unsafe housing before they were removed, and F.A.C. failed to make the necessary repairs to the home after the children were removed. F.A.C. allowed T.N.C. to be truant from school, and F.A.C. went to court for her behavior. Based on the evidence, the jury was permitted to infer that F.A.C.'s future conduct would comport with her prior conduct. *Jordan v. Dossey*, 325 S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied).

The only evidence presented of F.A.C.'s parenting ability was provided by the Department. This evidence included that F.A.C. failed to provide an appropriate living environment for the children and neglected to provide the children with proper medical care when they were sick. Evidence was also provided that F.A.C. was unwilling or unable to get T.N.C. to attend school and went to court due to T.N.C.'s truancy. The Department also provided evidence that there was physical abuse in the home; T.N.C. told Molina that her father hit her mother and that she was given an "ass whipping"

34

when she did something wrong. F.A.C. stated that she does not spank the children and only disciplines them by making them take a time-out. Evidence was presented that F.A.C. quit her job locally and moved three hours away from the children after the children were removed. After F.A.C. moved away, the Department was no longer able to contact F.A.C. regarding the children. The evidence showed that F.A.C. failed to inform the Department of her whereabouts and how to contact her and that F.A.C. made frequent address and phone number changes while her children were in the Department's care.

The evidence showed that the Department provided F.A.C. with several programs to assist her; however, F.A.C. did not avail herself of many of those programs. Although F.A.C. claimed that she completed parenting classes, Bridge testified that she did not believe that F.A.C. had shown that she is capable of caring for the children and that termination was in the children's best interest.

F.A.C. testified that her plans for the children are to better herself and to send the children to school. F.A.C. claimed that the children would live with her and a roommate in a two bedroom apartment. However, there was no evidence that F.A.C. had notified the Department of her new address or that the home was free from health and safety hazards as required by the service plan. The jury was free to infer that, because F.A.C. failed to notify the Department of her current address, it was impossible for the Department to determine whether the home was appropriate for the children.

The Department's permanency goal is non-relative adoption. The evidence showed that the Department had contacted fifteen of the father's siblings and that none were able to care for the children. Evidence was also presented that the temporary

35

placement of the children with relatives and a friend recommended by the parents "broke down" for various reasons and were inappropriate.

While in the custody of the Department, the children have been receiving proper and appropriate medical care. T.N.C.'s recurrent urinary tract infections and lice infestations had stopped and she was attending school. T.N.C. was academically "delayed" when the Department became involved; however, while in foster care, T.N.C. has improved and has learned her colors, numbers, how to write her name, and is able to write a paragraph. C.M.C. and J.P.C. are in bimonthly therapy and according to their counselor are "doing well." C.M.C. is also receiving speech therapy.

Bridge testified that F.A.C.'s home environment was not stable because F.A.C. lived in "at least nine addresses" during the pendency of the case. Again, Bridge was unable to determine where these addresses were located because F.A.C. failed to inform the Department of her change of address when she moved. Bridge did not believe that moving from home to home was a stable environment for the children. F.A.C. admitted that she has lived at six different addresses since her children were removed, and she agreed that such a living situation was not a stable environment for the children.

The jury heard ample evidence, much of which is set out above, of F.A.C.'s acts and omissions indicating that the parent-child relationship was not proper. F.A.C. did provide an excuse for her behavior—she moved three hours away from the children. However, the jury was free to find that making a choice to move three hours away from her children is not a proper excuse for F.A.C.'s behavior and failure to visit her children.

Viewing the evidence in the light most favorable to the jury's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 153.002; *In re J.L.*, 163 S.W.3d at 85; *In re D.S.P.*, 210 S.W.3d at 778.  We overrule F.A.C.'s final issue.

## V.   CONCLUSION

We affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
3rd day of November, 2011.