

# NUMBER 13-19-00319-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI–EDINBURG

## IN THE INTEREST OF F.L.B., A.C.B., J.G.B., E.B.M., CHILDREN

**On appeal from the 267th District Court
of Victoria County, Texas.**

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Perkes
Memorandum Opinion by Justice Perkes**

Appellant T.M. (Mother) challenges the termination of her parental rights to her youngest child, E.B.M.[1] *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(N), (O), (b)(2). By what we construe as two issues, Mother argues the evidence is legally and factually

---

[1] To protect the identity of the minor child, we utilize aliases for the child and related parties. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

insufficient[2] to support a finding that the Department of Family and Protective Services (the Department) met its burden to show: (1) Mother committed one or more statutory predicate acts or omissions under section 161.001(b)(1); and (2) termination is in the child's best interest. *See id.* We affirm.

## I. BACKGROUND

### A. The Department's Initial Case Involving F.L.B., A.C.B., J.G.B., and E.B.M.[3]

The Department first became involved in late 2013 after Mother's eldest daughter, F.L.B., outcried that her step-father B.M., a registered sex offender, had sexually abused her. As part of its initial investigation, the Department also determined that Mother: (1) physically and emotionally abused F.L.B.; (2) neglected A.C.B., J.G.B., and E.B.M.; (3) exposed all four children to domestic violence; and (4) failed to comply with the stipulations of the initial safety plan. Mother's four children were removed from the home, and the Department was granted temporary managing conservatorship of each child on January 17, 2014.

Mother was aware when she married B.M. that he was a registered sex offender, and until B.M. confessed, she refused to believe that F.L.B. had been sexually abused by him. B.M. was convicted of indecency with a child in connection with his abuse of F.L.B., and he was sentenced to fifteen years in prison on May 13, 2014. By October 2014, Mother had (1) completed parenting, anger management, and domestic violence classes; (2) attended individual counseling; and (3) obtained housing and gainful employment.

---

[2] Mother does not specific whether she challenges the legal or factual sufficiency of the evidence. Therefore, we address both. *See* TEX. R. APP. P. 38.9; *In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019).

[3] At the start of the originating case, F.L.B. and A.C.B. were eleven years old, J.G.B. was five years old, and E.B.M. was two years old. F.L.B. and A.C.B. are nine months apart in age.

Mother continued to consistently visit her children,[4] and the three eldest children were returned to Mother's home on November 6, 2015. Following one year of monitored return, the Department transferred sole managing conservatorship of F.L.B., A.C.B., and J.G.B. to Mother on October 4, 2016. E.B.M. remained in the Department's custody because, in the two years that had elapsed, Mother had declined to complete the Department's reunification goals specific to E.B.M.'s special needs.

On January 17, 2019, after E.B.M. had spent five years[5] in the Department's care, the Department filed a petition to modify the suit affecting the parent-child relationship and terminate Mother's parental rights under 161.001(b)(1)(N) (constructive abandonment) and (O) (failure to abide by the courts' orders) of the Texas Family Code. *See id.*

## B. Termination Hearing Involving E.B.M.

E.B.M. is a special needs, non-verbal seven-year-old, who has been diagnosed with cerebral palsy, congenital scoliosis, and autism. E.B.M. also suffers from seizures, hearing loss, and significant developmental delays. He is unable to eat solid foods, remains in pull-up diapers, and requires 24-hour care. When the Department first

---

[4] The record is unclear how frequent visitations were and where visitations occurred between 2014 and 2015. At some point prior to November 2015, Mother expressed concerns that she was unable to focus individually on E.B.M. during visitations because her three other children vied for her attention, and the Department began scheduling individual visitations with E.B.M. and Mother.

[5] Although not raised by Mother, as a housekeeping matter we note that the current Texas Family Code § 263.401 requires that the trial court must commence a trial on the merits within a year after the trial court renders an order appointing the Department as temporary managing conservator, and failure to do so will terminate the trial court's jurisdiction. *See generally* TEX. FAM. CODE ANN. § 263.401. However, the amendment to the statute took effect after the suit here was filed, and therefore the prior statutory language controls. *See In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 642 (Tex. 2009) ("[N]othing in the language of section 263.401 indicates that these deadlines are jurisdictional."); *see, e.g., In re M.M.*, No. 05-19-00329-CV, 2019 WL 4302255, at *1 (Tex. App.—Dallas Sept. 11, 2019, no pet. h.) (mem. op.) (holding that where the department filed for conservatorship in February 2016, and the case was tried in February 2019, the suit was governed by the then-controlling version of § 263.401).

intervened, E.B.M.—although already two years old—was unable to sit up or crawl. E.B.M. still requires a great deal of assistance, said Jessica Alex Morales, E.B.M.'s former case worker. Jessica testified to E.B.M.'s progress as well as to her observations of Mother's unwillingness to cooperate with the Department throughout the duration of the reunification plan.

E.B.M. was initially placed in a relative's home, but he was removed in January 2014 due to concerns regarding the home environment. E.B.M. then briefly resided in a foster home before being placed at Respite Care of San Antonio,[6] a residential care facility for children with special needs, where he remained until April 2019. Jessica testified E.B.M. thrived at Respite Care and described E.B.M. as a happy child, who can now walk,[7] interact with others, and feed himself. E.B.M. currently attends occupational, physical, and speech therapy, and he sees several medical specialists, including a neurologist, two orthopedists, an ophthalmologist, and a gastroenterologist.

Jessica explained that, as part of the Department's initial reunification plan, Mother was instructed, in relevant part, to: (1) complete parenting classes specific to caring for E.B.M.'s conditions; (2) participate in individual and family counseling with a therapist of her choice; (3) allow the Department to conduct home evaluations; (4) either in person or via telephone, attend E.B.M.'s medical appointments and participate in E.B.M.'s developmental therapies; and (5) visit E.B.M. at his placement "at least once per month."

---

[6] The record indicates Mother resided in Victoria and the surrounding area throughout the pendency of this case. We take judicial notice that the distance between Victoria and San Antonio is approximately 115 miles. *See In re A.D.B.*, No. 11-11-00117-CV, 2012 WL 2988815, at *5 (Tex. App.-Eastland July 19, 2012, no pet.) (mem. op.) (taking judicial notice of the distance between where the parents resided and where the child was placed while in foster care).

[7] Stelana Burns, director of Respite Care, testified that when E.B.M. first entered the center's care, doctors believed he would never be able to walk.

According to Jessica, Mother never provided proof of class attendance or completion though Mother was given information for free classes in her city. During cross-examination, Jessica conceded that while it was possible that Mother's employment kept her from attending classes, the classes were offered at the same time each month so Mother could have conceivably made arrangements in advance. There were also periods of time when Mother was unemployed.

Mother told Jessica that she continued to attend therapy after her eldest three children were returned to her care, but Mother "refused to sign releases". Consequently, the Department was unable to verify what, if any, progress had occurred.

Mother often withheld her residence information, relocating "at least six different" times over the five-year period. Mother was also reluctant to allow the Department to conduct home evaluations or speak with her other children, Jessica said. Jessica testified that she was told by Mother: "'[Y]ou can't come to my home. You can't talk to my children.'" Jessica said she tried to respect Mother's boundaries and agreed to meet Mother at her place of employment instead. In March 2018, "[Mother] said I was no longer able to go to her job. And at that point[,] she preferred to only meet with me via text[,] and she didn't understand why she had to meet with me in person." Because of Mother's persistent lack of cooperation, Jessica testified that the Department struggled to establish whether Mother's residence was a safe environment for E.B.M.[8] and whether Mother had an adequate support system in place to assist her in caring for E.B.M.

---

[8] The record indicates that E.B.M. was taken to Mother's residence on three occasions in 2017 for visitations, but the Department stopped allowing visitations at Mother's home after caseworkers noted the repeated presence of "hazards." The record was not further developed at trial.

In five years, Mother did not attend a single one of E.B.M.'s medical appointments or developmental therapy sessions either in person or via telephone, and visitations to E.B.M. were scarce though the Department offered Mother gas cards, bus passes, and alternatively, to have caseworkers drive Mother and her three children to and from E.B.M.'s out-of-town placement.

After prolonged periods of minimal contact with her son and minimal participation in the Department's service plan, Jessica opined that Mother had constructively abandoned E.B.M. Jessica testified that Mother's failure to create a substantial relationship with her son and educate herself on his care requirements resulted in a mother who was ill-equipped to raise a special needs, developmentally fragile child.

Megan Morales, E.B.M.'s current case worker, expounded on the severity of E.B.M.'s condition and reiterated many of Jessica's statements regarding Mother's noncompliance with the Department's reunification plan.

Megan testified that E.B.M., in addition to attending on-going weekly therapies, will need to undergo spinal surgery in the near future. Should Mother receive sole managing conservatorship of E.B.M., Mother would need to be able to frequently transport E.B.M. out-of-town because Victoria lacks the pediatric specialists to treat E.B.M. locally. Megan was not confident that Mother would be able to transport E.B.M. to his necessary appointments given Mother's inability to attend one of E.B.M.'s medical or therapeutic appointments in five years.

Megan said Mother made several attempts to visit her son as the termination hearing drew closer in mid-2019, visiting him four times. In contrast, Mother visited E.B.M. three times in 2017 and three times in 2018. Megan said Mother's conduct following

6

E.B.M.'s recent placement transfer [9] exemplified Mother's long-standing inability to remain consistently involved in E.B.M.'s life:

> She does not call me to ask me how his therapies are going[,] and she does not follow up with the placements regarding how he's doing. When he was placed in the foster home in Houston I—the foster mom was fine with [Mother] having her contact information. So I provided the number to [Mother], and it took her almost over a month to call foster mom.
>
> . . . .
>
> And foster mom said she was calling[,] and she called everyday for about a week-and-a-half and then the phone calls stopped. And from what I have gathered with reading the file is that that is [Mother's] pattern.
>
> . . . .
>
> And so that's just my concern is that when we get close to court . . . she wants to, you know, start working in services or reach out and see [E.B.M.]. But any other time, you know, there's those lapses to where she doesn't call or she doesn't visit . . . .

Mother had previously confided in Megan that "she felt that it would be fine for [E.B.M.] to live at a nursing home up until he was an adult or even afterwards."

In addition to the Departments observations regarding Mother's absence in E.B.M.'s life, Megan opined that Mother was unaware of how to adequately provide a safe environment for her son. Megan testified that, in December 2018, she asked Mother to explain the living arrangements should Mother receive custody of E.B.M.; Mother stated E.B.M. would share a bed with A.C.B., and F.L.B. could watch E.B.M. after school. Megan explained to Mother that her proposed arrangement would be inappropriate given A.C.B. suffers from oppositional defiant disorder, F.L.B. first displayed suicidal tendencies at the

---

[9] On April 5, 2019, E.B.M. was placed in a foster home in Houston, with foster parents experienced in dealing with special needs children. We, again, take judicial notice of the distance between Victoria and Houston, which is approximately ninety miles.

7

age of eleven and still struggles with major depressive disorder, and E.B.M. "is not verbal so he would not be able to make an outcry if something were to happen to him." Although Megan noted that Mother appeared amenable to learning how to better care for E.B.M., Mother's statements in 2018 were indicative of how little progress had been made since 2014.

Susan White, E.B.M.'s court appointed special advocate (CASA), appointed to the case at the onset, echoed Megan's statements. White testified that in 2018, Mother still "wasn't to the point where [she could say] [']I can do this for my child. I will do whatever it takes.[']" Instead, White recalled Mother expressing interest in having E.B.M. remain in facility care. "She was looking at long term [care] through a different facility," said White.

White described Mother as generally non-communicative and uncooperative. Although White was instrumental in Mother's reunification with F.L.B., A.C.B., and E.B.M., Mother repudiated any assistance from White once Mother received custody. Thereafter, Mother refused to allow White into her home. White stated she also tried referring Mother to multiple local support groups to no avail. "I did the research. I turned the research over to her. She said she was going to look them up, try to get into them. And that never happened."

White testified she also found it problematic that she had visited E.B.M. "triple" the number of times Mother had. "There's not a bond there," she said. White testified to her observations from the most recent visitation on May 30, 2019. She said E.B.M. spent the visitation hour "watch[ing] Baby Shark on [Mother's] phone and eat[ing] his mashed potatoes and drink[ing] his milkshake." According to White, Mother still had to be directed what foods were appropriate for E.B.M., who is prone to asphyxiation. The visitation was

8

typical, White said. White reasoned that Mother's documented behaviors, including her limited interactions with her son, are not those of a mother seeking to have a significant relationship with her child. White testified she was "in full agreement" with the termination of Mother's parental rights

Mother's counselor Michelle Chavez and cousin Debra Rodriguez portrayed a different image of Mother. Chavez, a licensed professional counselor in Victoria, first began seeing Mother when she was referred by the Department in 2016. Chavez described Mother as a "bull dog" advocate for her children. What has remained consistent, Chavez said, is Mother's desire to support her children, to educate herself on her children's needs, and to be reunited with E.B.M. Chavez said the reunification sentiment is shared by E.B.M.'s siblings, who also attend counseling with Chavez.

Chavez testified she treats F.L.B. for a major depressive disorder, A.C.B. for an adjustment disorder, and J.G.B. for an attention deficient disorder.[10] Chavez has seen each child for treatment over twenty-five times over the last three years. Meanwhile, Mother attended thirteen sessions in early 2016 and stopped attending individual counseling one week after she received sole managing conservatorship of F.L.B., A.C.B., and J.G.B. in late 2016. Despite the Department's request that Mother continue counseling services in preparation of reunification with E.B.M., Mother did not return to counseling until after the Department filed termination proceedings in 2019. Chavez

---

[10] Chavez was unaware if F.L.B. was still having auditory and visual hallucinations, stating that therapy was currently "focused on [addressing F.L.B.'s] depressive disorder." With respect to J.G.B.'s previous diagnosis of an Oppositional Defiance Disorder, Chavez said she has not "seen him be persistently pervasively in that state." Chavez alluded that she was not in agreement with J.G.B.'s initial diagnosis, stating, "That's a very strong disorder. I mean, I have seen him be upset. I have seen him have emotional meltdowns, but we have usually tracked them back to issues with dad, issues with adjusting to what he perceives is going on with [the Department]."

clarified that she had treated Mother for an "adjustment disorder" in 2016 in connection with her initial case with the Department, and because Chavez was "not actively working with [Mother] individual[ly]," she had no diagnosis for Mother at the time of trial.

Chavez, having never met E.B.M., said she was unable to provide a professional recommendation regarding Mother's ability to meet E.B.M.'s specific needs. "I don't know what his abilities are, what his functioning is as far as what he remembers or what he can remember. I haven't—I have seen a picture of E.B.M., but that's the extent . . . ."

With respect to Mother's transportation limitations, Chavez testified she was aware Mother did not have a valid driver's license.[11] Nonetheless, Chavez said Mother was able to get to appointments, relying on public "transit or other people." Chavez testified, "I never known [Mother] to cancel appointments because of lack of transportation."

According to Rodriguez, Mother's lack of presence in E.B.M.'s life is not for lack of caring. Rather, it is symptomatic of a struggling single-mother trying to do the best for all of her children. Rodriguez said Mother does "whatever is necessary to provide for her family," including working "two or three jobs at once" while simultaneously prioritizing her "other children's needs." Rodriguez identified herself as Mother's primary emotional support advocate but stated that her busy work schedule precluded her from being able to be "present physically" to help Mother with her children.

Mother was the last to testify. Mother confirmed she consistently worked two to three jobs to provide for her family, though she was currently unemployed and living off of F.L.B.'s social security income. Mother said although she owns a vehicle, she relies on

---

[11] Mother later testified her driver's license was suspended due to unpaid tickets.

10

public transportation to get to and from her places of employment because she does not have a valid driver's license and has made no attempts to validate her license during the pendency of the case. Mother explained where her focus has been:

> When the kids first came back to me they had so many more issues than what was—what they told me. . . . And I had to really focus on my babies. And I also had to assure them through counseling and being there with them that nothing that happened in the past was their fault and I—they had to hear me say that it was my fault that we got in that, and that took time. Did we—we missed [E.B.M.]. We still miss [E.B.M.]. But my relationship, they were what was in front of me.

Mother acknowledged that had she cooperated with the Department, she likely would not have faced termination proceedings, but argued that her actions through her other children demonstrate that she is a caring and capable parent. "I didn't ignore [the Department] and then fail my children. I did well by my children." Mother maintained that she independently sought resources to educate herself on E.B.M.'s needs. Moreover, Mother said she was willing and able to learn what she did not already know.

At the time of trial, Mother was unfamiliar with E.B.M.'s current and future medical and therapeutic needs, and Mother had seen her child approximately thirteen times despite more than 150 opportunities for visitation over three years.

The trial court determined the Department had proven by clear and convincing evidence that termination was appropriate under Texas Family Code §§ 161.001(b)(1)(N) and (O) and that termination was in E.B.M.'s best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(N), (O), (b)(2). This appeal followed.

## II. THE STATUTORY PREDICATE FINDING

### A. Standard of Review and Applicable Law

Section 161.001 of the Texas Family Code balances the convergent and divergent interests of a parent's constitutional right to "the companionship, care, custody, and management" of his or her child, *see Stanley v. Illinois*, 405 U.S. 645, 651 (1972), and the necessity of protecting a child's physical and emotional well-being via a promulgated two-part test. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) ("[T]he rights of natural parents are not absolute; protection of the child is paramount . . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))).

To terminate parental rights, the movant must prove by clear and convincing evidence that: (1) the parent committed one or more statutory predicate acts or omissions, and (2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.001(b). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630.

When the legal sufficiency of the evidence supporting termination is challenged, the reviewing court looks at if "viewing all the evidence in the light most favorable to the [factfinder] and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Only when the factual sufficiency of the evidence is challenged, does the inquiry become "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.*

Generally, a single predicate finding under § 161.001(b)(1) of the family code is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest.[12] *See In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). We therefore will affirm a judgment of termination if any one of the grounds is supported by legally and factually sufficient evidence, and the best interest finding is also supported by legally and factually sufficient evidence. *See id.*; *see also In re J.F.C.*, 96 S.W.3d at 266.

Mother first argues that the evidence is legally and factually insufficient to support a predicate finding that the Department met its burden to terminate Mother's parental rights under subsections (N) and (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O). We address each argument in turn.

## B.    Predicate Finding Under Subsection (N)

Subsection (N) provides for the termination of the parent-child relationship on grounds of constructive abandonment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N). To prove constructive abandonment by clear and convincing evidence, the Department must establish four elements: (1) the child has been in the custody of the Department for at least six months; (2) the Department made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. *See id*.

---

[12] A trial court's finding of termination under subsections 161.001(b)(1)(D) or (E)—even when another ground is sufficient for termination—requires additional review of (D) and (E) because of the potential consequences for parental rights to a different child. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). However, this case poses no such issue as the trial court terminated Mother's parental rights based on acts and omissions described in subsections 161.001(b)(1)(N) and (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O).

13

Here, the parties do not dispute that E.B.M was in the Department's care for a period longer than six months. However, we note that with regard to the remaining elements, Mother's brief on appeal contains but a conclusory statement that "the trial court [sic] failed to put on enough facts to demonstrate all [four] prongs of this test, specifically [element four]." Mother provides no citation to the record or authorities with respect to the various elements. *See* TEX. R. APP. P. 38.1(i). Nonetheless, finding the analysis of each element vital to our disposition, we address them individually. *See In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019) ("Courts must broadly construe issues to reach all core and substantive questions such that the merits of an appeal are addressed when reasonably possible to provide the party with a meaningful appeal.").

### 1. Reasonable Efforts to Return the Child to the Parent

"Returning the child to the parent, per section 161.001(1)(N)(i), does not necessarily mean that the child has to be physically delivered" to the parent. *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.). Instead, we consider whether the record reflects reasonable efforts by the Department to return the child back to his mother. *See In re F.E.N.*, 542 S.W.3d 752, 767 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("[T]he question is whether the Department made reasonable efforts, not ideal efforts.").

The Department's preparation and administration of a service plan, aimed at family reunification, satisfies this element. *See In re G.P.*, 503 S.W.3d 531, 533 (Tex. App.—Waco 2016, pet. denied) (providing that preparation and administration of service plans by the Department are reasonable efforts to reunite a parent and a child); *In re A.Q.W.*,

14

395 S.W.3d 285, 288 (Tex. App.—San Antonio 2013, no pet.) (same); *In re K.G.*, 350 S.W.3d 338, 354 (Tex. App.—Fort Worth 2011, pet. denied) (same).

The trial court heard evidence of the Department's service plan, which was prepared for and explained to Mother. E.B.M.'s caseworkers testified that the service plan was reviewed with Mother initially and following any changes to the plan, including after F.L.B., A.C.B., and J.G.B. were returned to the home and family reunification remained the goal for E.B.M. in 2017, when related adoption became the goal in 2018, and when unrelated adoption became the goal in 2019. At trial, Mother acknowledged that a reunification service plan had been in place and was explained to her. Mother also confirmed her signature on one of the family service plans. Therefore, a reasonable factfinder could have formed a firm conviction that the Department made reasonable efforts to return E.B.M. to Mother through its uncontroverted preparation and attempted execution of a reunification service plan. *See In re F.E.N.*, 542 S.W.3d at 767; *In re G.P.*, 503 S.W.3d at 533.

## 2. Failure to Regularly Visit Child or Maintain Significant Contact

The Department also presented evidence that Mother failed to regularly visit or maintain significant contact with E.B.M. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(ii). Over a three-year period with more than 150 opportunities for weekly visitation, Mother visited E.B.M. approximately twelve times; Mother's visitation history fell significantly short of the Department's minimum requisite goal of one visitation a month. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 309–10 (Tex. App.—El Paso 2009, pet. denied) (holding "it is clear that [the mother] did not regularly visit or maintain significant contact" with her child when she visited her child between six and eight times in a twelve-

15

month period); *In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.) (visiting only twelve times in nine months despite weekly scheduled visits supported termination for constructive abandonment). Additionally, Mother does not dispute that she failed to attend any of E.B.M.'s medical appointments or rehabilitation sessions.

Mother proffered reasons for her repeated absence—prior work commitments, lack of transportation, unavailable child care, prioritization of her other children. Although factored into the trial court's overall determination of parental fitness in the child's best interest analysis, for purposes of this subsection,[13] her explanations do not weigh against the existence of overwhelming evidence that Mother failed to regularly visit or maintain significant contact with her son. *See In re J.J.O.*, 131 S.W.3d at 630; *In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (holding evidence was legally and factually sufficient to support constructive abandonment where evidence reflected only intermittent visits); *see, e.g.*, *In re A.M.M.*, No. 04-15-00638-CV, 2016 WL 1359342, at *4 (Tex. App.—San Antonio Apr. 6, 2016, no pet.) (mem. op) (holding where a father only attended four visitations in a 17-month span and attributed his absences to the long distance between his residence and the city where his child resided, his "excuses for failure to comply with a court order and partial compliance do not factor into analysis of the issue of compliance with or satisfaction of a court order.").

Thus, in light of the entire record, a reasonable factfinder could have formed a firm conviction that Mother did not regularly visit or maintain significant contact with E.B.M.

---

[13] While the legislature has allotted for consideration of a parent's "good faith effort" under a subsection (O) analysis, we note that no such defense exists for subsection (N). *See* TEX. FAM. CODE ANN. § 161.001 (d)(2) (providing that a "court may not order termination under Subsection (b)(1)(O) based on the failure by the parent . . . if a parent proves by a preponderance of evidence that: . . . the parent made a good faith effort to comply . . . .").

*See In re A.B.*, 437 S.W.3d 498, 506 (Tex. 2014); *M.C.*, 300 S.W.3d at 309–10; *In re J.J.O.*, 131 S.W.3d at 630.

### 3. Inability to Provide Child with a Safe Environment

Finally, we review whether the evidence proffered by the Department proves that Mother demonstrated an inability to provide E.B.M. with a safe environment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(iii). The factfinder may consider (1) the child's age and physical and mental vulnerabilities; (2) any history of abusive or assaultive conduct by the child's family; (3) the mother's willingness to complete ordered services; and (4) whether a parent possess adequate parenting skills, including an understanding of the child's needs and capabilities. *See In re M.R.J.M.*, 280 S.W.3d 494, 506 (Tex. App.—Fort Worth 2009, no pet.).

Mother reasons that had the environment she provided been truly unsafe for E.B.M. "then surely [t]he Department would have sought to remove the other three children from [her] care as well." Mother's inference is without application of significant factors, *see id.*, because it is undisputed that E.B.M. differs greatly from Mother's other three children. E.B.M.'s physical and mental delays render him especially vulnerable to abuse and neglect—which is especially problematic given the basis for the Department's intervention. E.B.M., who was a toddler at the time, was unable to walk—a medical and developmental delay that doctors initially believed to be of lifelong consequence. Although evidence indicates that E.B.M. has progressed significantly since entering the Department's custody and receiving the necessary medical and therapeutic interventions, E.B.M.'s developmental success relies on continual intervention and access to care.

17

The record further demonstrates that the Department was unable to verify whether Mother had made any progress to better care for her developmentally and medically fragile son because, despite Mother's acknowledgement of the terms and requirements of the court-ordered service plan, Mother declined to: attend parenting classes; participate in family therapy; allow the Department to conduct home evaluations; and be present in person or via telephone during any of E.B.M.'s medical appointments and developmental therapy sessions. *See, e.g.*, *In re S.R.*, No. 02-11-00153-CV, 2012 WL 4465153, at \*17 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op) (holding that termination is appropriate on grounds of child endangerment where a parent has a medically fragile child, and evidence was presented that Mother still "does not comprehend the severity of [her child's] medical condition," that Mother "did not complete or even attempt any additional medical training," and that "Mother's older child is rambunctious, active, and curious, and that he presents a danger to [Mother's special needs child]"). The Department illustrated Mother's inability to provide her son with a safe environment via testimony that Mother inappropriately wanted to task her eldest minor daughter to care for E.B.M. when she was at work, and Mother still had to be informed what was suitable for her asphyxiation-prone son to eat during a visitation one month before trial.

The evidence presented here "rises above abstract concepts of danger or metaphysical injury to" a child and establishes that: (1) E.B.M. is a child whose developmental progress is contingent on receiving continued and consistent care, and (2) Mother is unable to provide E.B.M. with a safe environment as she remains unaware of the extent of E.B.M.'s limitations and what E.B.M.'s daily care entails. *See id.*; *M.C.*, 300 S.W.3d at 310; *In re J.J.O.*, 131 S.W.3d at 630. Therefore, the trial court could have

formed a firm belief that Mother constructively abandoned E.B.M., and the disputed evidence is not so significant that a reasonable fact-finder could not form a firm belief of this finding. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother's first point is overruled.

## C.    Predicate Finding Under Subsection (O)

Having already found sufficient evidence to support a finding of parental termination under subsection (N), we need not address whether termination was appropriate under subsection (O). *See In re N.G.*, 577 S.W.3d at 234. Mother's second point is overruled.

### III.    THE CHILD'S BEST INTEREST FINDING

## A.    Applicable Law

As previously established, in addition to a predicate violation, the Department must prove by clear and convincing evidence that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *see also id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

A factfinder may consider a number of factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent.

19

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.N.C.*, 384 S.W.3d 796, 807–08 (Tex. 2012) (reciting the *Holley* factors). Our "best interest" analysis is not limited to these *Holley* factors, and the absence of evidence regarding some of the factors does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

**B.     *Holley* Analysis**

**1.     Child's Desires**

E.B.M. did not testify. *Holley*, 544 S.W.2d at 371–72 (discussing the fact finder's consideration of the child's desires). E.B.M. was seven years old at the time of trial and non-verbal. *See id.*; TEX. FAM. CODE ANN. § 263.307(b)(1). The trial court was nonetheless entitled to consider evidence that the child spent minimal time in the presence of the parent and that no emotional bond exists between the child and the parent. *See In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re D.R.M.*, No. 13-17-00320-CV, 2017 WL 6616738, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 28, 2017, no pet.) (mem. op).

E.B.M.'s case workers and CASA testified that Mother had minimal contact—thirteen visits out of 156 visitation opportunities in three years and no medical or therapeutic appointment accompaniment—with E.B.M. despite available transportation by the Department. As a consequence, they contend no emotional bond had been created. Mother, her counselor, and relative argue otherwise, with the latter two witnesses yielding on cross-examination that a mother's inability to visit her child frequently would have some effect on the mother-child relationship. Although disputed, this factor

nonetheless weighs in favor of termination. *Holley*, 544 S.W.2d at 371–72; *see In re I.D.G.*, 579 S.W.3d 842, 854 (Tex. App.—El Paso 2019, no pet. h.) (providing that evidence that a child "has spent minimal time in the presence of a parent is relevant to the best interest determination under the desires of the child factor.").

2.    **Child's Emotional & Physical Needs; Parent's Abilities; Available Programs**

A factfinder may also infer that a parent's past inability to meet a child's physical and emotional needs at the time the child was in the parent's custody may be indicative of the parent's future inability to meet the child's physical and emotional needs if the child is returned to the parent. *D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ).

The record here is replete with evidence indicating that Mother was unable to meet E.B.M.'s physical and emotional needs at the outset when she (1) exposed him to domestic violence and abusive conduct towards his eldest sister, and (2) neglected him to a consequential extent. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(E) (stating courts may consider whether parent has adequate skills to protect child from repeated exposure to violence although violence may not be directed at child); *Holley*, 544 S.W.2d at 371–72; *see also Garza v. Tex. Dep't. of Human Servs.*, 794 S.W.2d 521, 525 (Tex. App.—Corpus Christi–Edinburg 1990, no writ) (holding that a parent's lack of judgment, parenting skills, and inability to provide adequate nutrition to her children are factors to consider in a parental termination analysis).

Evidence of Mother's continued inability to provide a stable home or comply with a court-ordered service plan—which included attending her son's therapeutic and medical

21

appointments[14]—also supports a finding that termination is in the child's best interest. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting parent's inability to provide stable home supports finding that termination is in best interest of child); *see also A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App—El Paso 2012, no pet.) (providing that conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that a parent's failure to comply with family service plan supports finding that termination is in best interest of child).

In place of evidence refuting the Department's claims, Mother urged the trial court to accept her declaration of change. On appeal, Mother argues the evidence "shows merely that [her] failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to interference or malice." *See Clark v. Dearen*, 715 S.W.2d 364, 368 (Tex. App.—Houston [1st Dist.] 1986, no writ). Mother relies heavily on *Clark*, and we find *Clark* to be distinguishable. *Id.* In *Clark,* our sister court reversed the termination of a father's parental rights, concluding the Department did not provide clear and convincing evidence that termination was in the child's best interest. *Id.* The father in *Clark* was physically disabled from a back injury, living off social security and food stamps in a trailer park, and unable

---

[14] Evidence indicated E.B.M. still requires extensive continual therapeutic and medical care and will need to undergo multiple spinal surgeries in the near future. However, there are no pediatric physicians in Mother's city specializing in the care E.B.M. currently receives. For E.B.M. to continue to receive treatment, Mother would be required to regularly transport E.B.M. to San Antonio or Houston. The Department argues on appeal that considering Mother made no attempts to attend her child's appointments in the last five years, there was nothing to indicate that would change should the child be returned to her conservatorship. We agree.

to procure a driver's license because he was illiterate. *Id.* The Department provided evidence that the father lived in an unkept residence and although the child was otherwise healthy, he appeared dirty. *Id.* The Department then used evidence that the father had not seen his child in two years as proof of parental negligence. *Id.* However, the father had initially visited his son regularly, only ceasing visitations after his son was moved and placement refused to allow the father contact. *Id.* Based on these facts, the court held that termination of the parent-child relationship was not justified. *Id.*

Whereas, the evidence here indicates Mother is an able-bodied parent, who was unable to procure a driver's license by choice, who refused to allow the Department to evaluate her home for placement suitability by choice, who declined to attend services by choice, who abstained from participating in her child's therapies whether in person or by phone by choice, and who only sporadically visited her child by choice. *Cf. id.* Mother's "misfortune" and "lack of intelligence or training," although influenced by impoverishment, were then compounded by Mother's repeated rejection of the Department's assistance. *Id.*; *see also In re E.J.M.*, No. 04-17-00569-CV, 2018 WL 280664, at *8 (Tex. App.—San Antonio Jan. 3, 2018, no pet.) (mem. op) ("A parent's 'lack of education, training, or misfortune' are properly considered under the *Holley* factors, but these factors do not negate all other evidence tending to show that termination is in the child's best interest."); *see generally In re T.T.F.*, 331 S.W.3d 461, 483–84 (Tex. App.—Fort Worth 2010, no pet.) (discussing a parent's conduct and noting the difference between impoverishment and a parent's failure to avail herself of available resources).

Mother testified at trial that had she availed herself to the Department's resources, she would likely not be facing termination proceedings. We agree. As Mother

23

demonstrated in the five months leading up to trial, when she began attending family counseling and exceeded the number of visitations from the previous year, Mother's inability to complete the family service plan between 2014 and 2019 and reunite with her youngest son was not for lack of ability or availability of resources. Moreover, we find Mother's financial disposition does not provide justification for many of her acts and omissions, including: her exclusion of the Department from her current residence so that they were unable to evaluate home suitability; her failure to contact her son's primary care or treating physicians and therapists via telephone before, during, or after any of his treatments; and her refusal to accept the Department's monthly transportation, during which she was permitted to bring her three other children—the same three children she testified are currently left alone and cared for by her eldest minor daughter.

Mother's promises of parental growth and claims of accountability aside, the aforementioned evidence supports a finding that Mother had several opportunities to take initiative and to learn to care for her special needs child; nonetheless, by the time of trial, Mother did not yet possess the parental ability to care for E.B.M. presently or in the future. *See* TEX. FAM. CODE ANN. §§ 263.307(b)(10), (11), (12); *Holley*, 544 S.W.2d at 371–72; *see also Wilson v. State*, 116 S.W.3d 923, 925 (Tex. App.—Dallas 2003, no pet.) (providing that the fact that a parent has poor parenting skills and "was not motivated to learn how to improve those skills" is evidence supporting a finding that termination is in the child's best interest). Therefore, these factors weigh in favor of termination.

### 3.      Plans for Child; Stability of Home or Proposed Placement

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in a child's best interest. *In re J.G.S.*,

574 S.W.3d 101, 126 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Stability and permanence are paramount in the upbringing of children.").

The Department presented evidence that E.B.M. is doing well in his current placement and that the foster family has extensive experience with special needs children. The Department noted that the current placement, although open to adoption, was not seeking to adopt E.B.M. at the time of trial. The foster family was primarily focused on E.B.M.'s impending spinal surgery and supporting E.B.M. throughout the recovery process. Meanwhile, there was no testimony regarding Mother's plans for her child beyond the abstract. Mother testified that she was aware her work hours, once she secures employment, would have to be flexible, and she stated that she would be sure to make time and find the means to transport E.B.M. to any appointments. However, again, the trial court could infer from Mother's failure to take the initiative to utilize the available programs and attend E.B.M.'s appointments in the past as evidence that she would not have the ability to motivate herself in the future. *See Holley*, 544 S.W.2d at 371–72; *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.). Therefore, these factors also weigh in favor of termination.

### 4.    Remaining Factors

With regard to the final *Holley* factors, Mother's acts and omissions suggesting a fruitless mother-child relationship, along with Mother's justifications, have been discussed in significant detail above. *See Holley*, 544 S.W.2d at 371–72; *see also In re D.W.*, 445 S.W.3d 913, 932 (Tex. App.—Dallas 2014, pet. denied) (providing that evidence considered in other *Holley* factors may be relevant in analyzing the final two factors).

Analyzing the evidence under the applicable law and appropriate standards of review, we hold that a reasonable trier of fact could form a firm belief or conviction that termination was in the best interest of E.B.M. and likewise could conclude that any disputed evidence regarding the *Holley* factors is not so significant that it would prevent a reasonable factfinder from forming a firm belief or conviction. *See Holley*, 544 S.W.2d at 371–72; *see also In re A.J.M.*, No. 04-17-00681-CV, 2018 WL 1511824, at *7 (Tex. App.—San Antonio Mar. 28, 2018, pet. denied) (mem. op) (holding that the trial court's conclusion regarding the termination of parental rights under section 161.001(b)(1)(N) to be probative in determining the child's best interest). We overrule Mother's last issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Delivered and filed the
5th day of December, 2019.